Clinton REILLY, Plaintiff,

v.

The HEARST CORPORATION and The Chronicle Publishing Company, Defendants.

No. C–00–0119–VRW.

United States District Court, N.D. California.

July 27, 2000.

Joseph M. Alioto, Joseph M. Alioto Law Firm, San Francisco, CA, John G. Shulman, Daniel R. Shulman, Jim Hilbert, Shulman, Walcott & Shulman, P.A., Minneapolis, MN, Angelina Alioto–Grace, Alioto Law Firm, San Francisco, CA, for Clinton Reilly, Plaintiffs.

Gary L. Halling, Thomas D. Nevins, Sheppard Mullin Richter & Hampton, San Francisco, CA, Gerald A. Connell, Baker & Hostetler, Washington, DC, J. Thomas Rosch, Peter K. Huston, Gregory P. Lindstrom, Latham & Watkins, San Francisco, CA, for the Hearst Corporation the Chronicle Publishing Company, defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WALKER, District Judge.

In this private antitrust case, plaintiff challenges two transactions involving the general circulation daily newspapers in San Francisco. The publishers of the city's two major dailies have reached an agreement pursuant to which Hearst Corporation, publisher of the San Francisco Examiner, will acquire Chronicle Publishing Corporation's San Francisco Chronicle. The antitrust ramifications of this transaction and a companion deal involving the future of the Examiner were the subject of a trial to the court on May 1–5, 9–12 and 15. The court now makes its findings of fact and draws conclusions of law.

## PARTIES

Plaintiff Clint Reilly is a real estate investor, former professional political campaign manager/consultant and unsuccessful candidate for mayor of San Francisco in the 1999 municipal elections. Reilly is a subscriber to the San Francisco Chronicle newspaper and a purchaser of single copies of the San Francisco Examiner newspaper.

Defendant The Hearst Corporation (Hearst) is a New York City-based media company engaged in newspaper, magazine and book publishing, television broadcasting and ranching, among other businesses. Hearst was founded in 1887 by William Randolph Hearst and, through trusts, is owned by his descendants. Hearst is publisher of the San Francisco Examiner newspaper.

Defendant The Chronicle Publishing Company (CPC) is a Nevada corporation headquartered in San Francisco. At all relevant times, CPC was publisher of the San Francisco Chronicle newspaper, licensee of KRON–TV, a television station in San Francisco affiliated with the NBC television network, and operator of Bay TV, a cable television station. CPC also until recently engaged in book publishing and owned newspapers in Bloomington, IL, and Worcester, MA. CPC is owned by the descendants of Michael H de Young who, along with his brother Charles, founded the San Francisco Chronicle newspaper in 1865.

Intervenor-defendant ExIn Corporation is a California limited liability corporation formed by members of the Fang family, including Florence Fang and her son Ted

Fang, for the purpose of acquiring certain assets associated with the Examiner. The Fang family also owns Grant Publishing Company and Pan Asia Venture Capital Corporation and publishes The Independent, a three-times-a-week free distribution newspaper, and other publications that circulate in the San Francisco Bay area.

## VIOLATIONS ALLEGED

Plaintiff alleges that an August 6, 1999, contract by which Hearst agreed to acquire from CPC assets associated with the Chronicle newspaper constitutes an unreasonable restraint of trade in violation of section 1 of the Sherman Act, 15 USC § 1, an unlawful attempt and conspiracy to monopolize in violation of section 2 of the Sherman Act, 15 USC § 2, and calls for an acquisition of assets that will substantially lessen competition or tend to create a monopoly in trade and commerce in violation of section 7 of the Clayton Act, 15 USC § 18.

In a proposed amended complaint, plaintiff also attacks under the same provisions of the antitrust laws a March 16, 2000, contract by which Hearst agreed to transfer certain assets associated with the Examiner newspaper and make payments to ExIn.

## JURISDICTION AND PROCEEDINGS

This court has jurisdiction of an action arising under the federal antitrust laws pursuant to 28 USC §§ 1331 and 1337 and sections 4 and 16 of the Clayton Act, 15 USC §§ 15, 26.

Plaintiff filed this action on January 11, 2000, challenging the August 6 contract and seeking injunctive relief under section 16 of the Clayton Act, 15 USC § 26. Because the March 16 transaction post-dated the initial complaint, plaintiff initially sought to enjoin only CPC's sale of the Chronicle to Hearst. With the development of the Hearst–ExIn transaction, all parties consented to ExIn's intervention as a defendant.

On March 30, 2000, the court granted plaintiff's motion for a temporary restraining order enjoining the transfer of assets contemplated by the August 6 agreement between Hearst and CPC. This order effectively enjoined the March 16 transaction, performance of which is contingent upon completion of the August 6 transaction. In the wake of this ruling, the parties agreed to extend the temporary restraining order and proceed immediately to trial without a preliminary injunction hearing.

At the close of evidence, plaintiff moved to amend his complaint to conform with the evidence presented at trial and the court by this order grants that motion. Plaintiff's first amended complaint contains factual allegations regarding Hearst's transaction with ExIn and seeks to enjoin that transaction.

## PLAINTIFF'S STANDING

Plaintiff claims standing as a subscriber to the Chronicle and single-copy purchaser of the Examiner and as a potential purchaser of the Examiner assets that Hearst has agreed to transfer to ExIn. Ordinarily, the issue of plaintiff's standing to sue would have been litigated and decided in pretrial proceedings. Because the parties decided to proceed immediately to trial without the usual pretrial proceedings, this issue was submitted as an issue for trial.

Standing under Article III of the United States Constitution demands that the plaintiff have a sufficient interest in the outcome of the controversy to ensure that the court will be provided with a fair presentation of the issues. The Supreme Court has identified three constitutional standing requirements. A party seeking to invoke federal jurisdiction must demonstrate: (1) injury to a legally protected interest; (2) a causal relationship between the injury and the challenged conduct and (3) a likelihood that the injury will be redressed by a favorable decision. *Northeastern Florida Contractors v. Jackson-*

*ville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

In an action seeking relief under the antitrust laws in issue, plaintiff faces the additional requirement of showing that the actual or threatened injury to plaintiff also constitutes an injury to competition. See, for example, *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 109–113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

 Standing analysis in this case is informed, in part, by the Newspaper Preservation Act (NPA), 15 USC §§ 1801–1804. The NPA provides an antitrust exemption for an otherwise unlawful combination or merger of two newspapers' business operations if the market for newspaper circulation and advertising does not provide sufficient revenue to support independent publication of the newspapers. In that situation, the NPA permits two newspaper firms to combine their business operations as long as they continue to produce separate newspapers.

Although the NPA does not confer affirmative rights on newspaper readers or advertisers or competing newspaper firms, the Sherman Act and Clayton Act should be read bearing in mind the legislative purposes that prompted enactment of the NPA; namely, encouragement of multiple sources of newspaper news, features and opinion. The NPA thus imports distinctly non-economic considerations into the antitrust statutes, which otherwise exclusively confine their scope to matters of economic consequence. Under this statutory framework, the elimination of a newspaper represents a cognizable injury to interests protected by the antitrust laws, and this injury supplies a ground for standing under Article III.

Plaintiff claims that the challenged transactions would eliminate one of only two providers of daily newspaper news, features and opinion in what plaintiff contends is the relevant market. This position was more starkly apparent at the time plaintiff filed his initial complaint, when Hearst's stated intention was to cease production of the Examiner and no buyer had come forward with plans to preserve a paper under that name. The March 16 transaction purports to maintain the Examiner as an independent source of newspaper news, features and opinion and thus would appear facially consistent with the goals of the NPA and, ironically enough, with plaintiff's purported objective in maintaining this litigation. Plaintiff contends, however, that the March 16 transaction is a sham, a fig leaf for conduct that violates sections 1 and 2, and will merely postpone the ultimate annihilation of an otherwise economically viable Examiner. These claims, while novel, would appear to state a cognizable injury to plaintiff as a consumer of newspaper news, features and opinion and to competition in that market; if proved, such a claim would entitle plaintiff to injunctive relief under section 16 of the Clayton Act, 15 USC § 26.

It follows from the analysis above that plaintiff's standing is limited; as a consumer of newspaper news, features and opinions, he is entitled to attempt to prove that the challenged transactions cause injury to competition for readers among economically viable newspapers. Based on the markets in which newspapers compete, there are two other possible bases for standing to challenge the transactions at bar: alleged injury to advertisers or to competing publishers. Plaintiff does not claim standing as a purchaser of advertising in the newspapers published by Hearst and CPC; the effect of the transactions at bar on the market for advertising is not, therefore, an issue that plaintiff has standing to raise. Plaintiff's failed attempt to acquire the Examiner might afford him standing as a potential publishing competitor, but, for reasons to be discussed presently, plaintiff's claim in this regard fails at the outset because of the anticompetitive nature of his offer to acquire the Examiner. Because plaintiff's standing as a potential competitor fails, he cannot challenge, among other things, provisions of the joint operating agreement restricting the sale of a JOA publication (such as the right of first refusal and 60–mile provisions).

## ORIGINS OF HEARST–CPC PARTNERSHIP

In 1959, four general paid circulation newspapers were published in San Francisco by three competing firms: CPC's Chronicle was a daily morning and Sunday newspaper; Hearst published a daily morning and Sunday newspaper, the Examiner, as well a six-day afternoon newspaper, the Call–Bulletin; Scripps–Howard published a six-day afternoon newspaper, the News. In 1959, Hearst bought the News and re-titled its afternoon offering the News–Call–Bulletin.

Between 1959 and 1964, Hearst and CPC competed vigorously for circulation and advertising. Both firms suffered losses on their San Francisco newspapers. Hearst underwrote these losses from its other operations; CPC survived largely through the profits of KRON–TV. By 1964, the Chronicle enjoyed an advantage in daily circulation while the Examiner had a greater Sunday circulation.

On October 23, 1964, Hearst and CPC entered into a joint operating agreement (JOA) which became effective in 1965. That agreement formed the San Francisco Newspaper Agency (SFNA), a corporation owned in equal shares by Hearst and CPC to which the companies delegated responsibility for printing, distribution and advertising sales of both papers and transferred assets associated with those functions. SFNA immediately undertook a reorganization of the companies' newspaper offerings. First, SFNA ceased publication of the News–Call–Bulletin and shifted the morning Examiner to the afternoon. Second, SFNA began producing a combined Sunday newspaper, with the news portion published under the Examiner masthead and employing Examiner features, while a datebook and book review section and an opinion and commentary section were published under the Chronicle masthead. The non-Sunday Chronicle and Examiner remained separate editorial products with all business operations under the direction of SFNA.

Under the terms of the joint operating agreement, which persist to the present, SFNA bears all costs of publication other than those associated with creating editorial content and collects all revenues generated by advertising sales and circulation. The excess of revenue over expenses is then distributed equally between Hearst and CPC, regardless of the costs and revenue attributable to each newspaper in the joint operation.

The original term of the JOA was thirty years, with each party entitled to one ten-year renewal for a maximum potential term of fifty years. In 1995, Hearst exercised its renewal right, extending the JOA until 2005. In 1997, CPC gave notice that it would not extend the JOA beyond 2005, thereby ensuring its termination in that year at the latest.

In entering the JOA, Hearst and CPC followed the lead of other newspaper publishers in the United States who, beginning in the years of the Great Depression, negotiated similar agreements designed to achieve economies in the business operations of previously competing newspapers while maintaining separate editorial operations. One of the earliest such agreements was negotiated in Tucson, AZ, between the publishers of the Tucson Daily Citizen and the Arizona Daily Star.

In 1969, the United States Supreme Court affirmed a district court decision holding that: (1) the Tucson joint operating arrangement constituted a price fixing, profit pooling and market allocation agreement illegal per se under section 1 of the Sherman Act; (2) the agreement gave the newspapers monopoly power and was in furtherance of a conspiracy to monopolize in violation of section 2 of the Sherman Act; and (3) the acquisition of one of the parties in 1965 pursuant to the terms of the joint agreement was in violation of section 7 of the Celler–Kefauver Act amendments to the Clayton Act. *Citizen Publishing Co. v. United States,* 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). This rendered the Hearst/CPC joint oper-

ating agreement and other similar agreements in probable violation of the antitrust laws.

The government challenge to the Tucson agreement prompted JOA publishers—even before the *Citizen Publishing* decision—to lobby Congress for protection. Enactment of the NPA in 1970 exempted the Hearst/CPC joint operating agreement from illegality.

## A TROUBLED ALLIANCE

Lobbying efforts saved existing JOAs from imminent legal assault, but history suggests that the Hearst/CPC agreement was not worth saving. The joint venture embodied in the JOA has over time proved to be a problematic partnership, due to changing trends in the newspaper business and disincentives to the parties inherent in the structure of the agreement.

The performance of both papers, as measured by total circulation figures, has been stagnant or worse. In 1964, the overall combined daily and Sunday circulations of the Chronicle and the Examiner were 652,845 daily, 766,580 Sunday; by 1990, combined daily circulation had risen to 704,493, and Sunday circulation had dropped to 711,819. But by 1998, the overall combined daily and Sunday circulations had fallen to 597,042 and 605,354, respectively. Over the decade prior to trial, circulation has declined dramatically: the daily Chronicle's circulation has fallen 17.8 percent, the daily Examiner has seen a 21.3 percent decline and circulation of the Sunday product is down 17.7 percent.

Although consumer preferences and other market forces have made daily newspaper growth difficult, the JOA itself bears some of the blame for the poor performance of the venture. In particular, its equal profit split diminishes the economic incentives of the parties to devote the necessary resources to optimize readers' acceptance of the two newspapers; for each dollar spent on improving its newspaper, the JOA party reaps only fifty cents of any resulting profit. The result, in the words of defendants' expert, is that San Francisco has been "undernewspapered for some time."

The profit-sharing agreement has also contributed to profound tension within the JOA. The JOA contemplates partners of relatively equal strength, as the newspapers of Hearst and CPC were at the JOA's inception. For a number of reasons, this equilibrium has disappeared rather dramatically, as reflected by the steady growth of daily circulation of the Chronicle relative to the Examiner since inception of the JOA. In 1964, the Chronicle's daily circulation was 351,489, as opposed to the Examiner's daily circulation of 301,356. By 1998, daily circulation of the Chronicle was 482,268, while the Examiner's daily circulation had diminished to 114,774. Since 1998, the circulation of the Examiner relative to the Chronicle has fallen further. At the time of trial, the Chronicle's daily circulation exceeds that of the Examiner by better than 4:1.

An important factor accounting for the Chronicle's relative growth is that paper's position in the morning publication cycle. Due to heavier daytime road traffic, a morning newspaper distributed at night or in the early morning hours enjoys greater flexibility and ease in making home deliveries in a large urban region such as the San Francisco Bay area. Morning newspapers are also better geared to lifestyle, work and commuting patterns predominant in urban areas than evening newspapers and are less affected than evening newspapers by competition from television news. As a consequence, evening newspapers have largely disappeared from most of the nation's major urban centers.

By virtue of the JOA profit-sharing terms, however, the loss of Examiner readers to the Chronicle actually benefitted Hearst. Since defection of readers to the Chronicle did not affect Hearst's share of the JOA net excess, Hearst found that it could shift the burden of meeting the demands of a larger readership to CPC, cut its own costs and increase Hearst's profitability within the JOA. This has been

Hearst's strategy for most of the duration of the JOA. Conversely, as the Chronicle's relative circulation grew, the Examiner became a drain on CPC that hindered its efforts to compete with other regional newspapers.

## THE CHRONICLE SALE

In 1993, CPC hired as chief executive officer John B Sias, the first non-de Young family member to run the company. Sias had extensive prior experience in the media business.

In the years 1995 to 1999, representatives of Hearst and CPC had intermittent discussions and exchanges of correspondence about the impending termination of the JOA. Sias and his counterpart at Hearst, Frank A Bennack Jr, exchanged much of that correspondence. Hearst and CPC representatives discussed several possibilities, including the option of closing the Examiner and giving Hearst a percentage participation in the Chronicle's profits.

By October 1997, Sias had informed Bennack that CPC would not exercise its right to extend the JOA and that the JOA would, therefore, expire in 2005. The JOA provides that at the end of the term of the agreement, Hearst and CPC will cooperate in dissolving SFNA to enable both companies to engage in publishing their respective newspapers separately.

But Sias and Bennack regarded the prospect of separate publication and head-to-head competition after termination of the JOA as hopelessly unrealistic. The economics of the newspaper industry have made it virtually impossible for more than one general circulation daily newspaper to survive in competition in the same city. When one newspaper rises to a certain dominance in a geographic area, advertisers are able to reach their intended audiences with placements in one newspaper rather than two or more; to cut advertising costs, advertisers have tended to eliminate advertising in the smaller general circulation papers. Since lower circulation rates lead to fewer advertisements, and fewer advertisements make a newspaper less attractive to readers who value the information advertisements provide, declines in advertising and circulation tend to aggravate one another. This process gathers momentum and the decline in a weaker newspaper's business becomes self-fulfilling, leading almost inevitably to its demise.

These economic forces have played out in city after city across the United States, eliminating newspapers that directly compete in the same geographic area in all but a handful of the largest metropolitan newspaper markets in the country. At trial, only five such major cities were identified (Boston, Chicago, Denver, New York and Washington) and, during trial, the publishers in one of those cities (Denver) announced their intention to enter a joint operating arrangement. It is widely believed in the newspaper industry that in at least two, if not all, of the four cities in which there are directly competing general circulation metropolitan daily newspapers covering the same geographic area, the smaller newspapers operate at substantial deficits.

For these reasons, both Sias and Bennack believed that only one of the two San Francisco newspapers produced by SFNA could survive termination of the JOA. Although Sias and Bennack threatened each other with the prospect of head-to-head competition at the end of the JOA, such threats were simply posturing in business negotiations, not genuine expressions of intent.

Bennack set ownership of the surviving newspaper as a long-term goal for Hearst. Several factors left Hearst well-positioned to achieve this goal. First, it seemed likely that CPC would sell. CPC shareholders had in recent years been riven by discord and animosity, much of it centered on the direction of CPC. Many CPC shareholders have much of their wealth tied up in illiquid CPC stock and depend on distributions from CPC to maintain their living standards. Bennack was aware of these circumstances and their potential effect on the ability and willingness of CPC to re-

main in the business of publishing the Chronicle.

Second, the JOA gave Hearst a strong position vis-a-vis other potential bidders. Hearst already owned half of all assets of SFNA. Furthermore, certain provisions of the JOA gave Hearst rights against outside buyers, including a right of first refusal and the right to prevent a sale of the Chronicle to a publisher of a newspaper within sixty miles of San Francisco. Although the legality of these provisions is suspect, they constituted another bargaining chip for Hearst.

Finally, Hearst faced no financial exigencies. Its financial strength relative to CPC gave it leeway and bargaining power and, unlike CPC, it viewed its position within the JOA as a sound investment, thanks largely to the free riding Hearst enjoyed via the equal profit split.

Nevertheless, the expiration of the JOA in 2005 imposed a limit on Hearst's ability to hold out; at expiration of the JOA, the Examiner, with its circulation a mere fraction of that of the Chronicle, was a sure loser as a separate newspaper. Bennack had leverage to achieve Hearst's goal of owning the surviving San Francisco newspaper, but it would gradually diminish as 2005 approached. As the twentieth century drew to a close, the time for Hearst to move drew nigh.

In January 1999, Hearst transferred Timothy O White from its Albany, NY, newspaper to San Francisco to become publisher of the Examiner. In addition to running the Examiner, White's assignment was to take charge of shepherding Hearst through termination of the JOA and a takeover of the Chronicle.

In February 1999, CPC hired Donaldson Lufkin & Jenrette (DLJ), an investment banking firm, to advise CPC shareholders concerning their investments in CPC. DLJ's analysis covered all of CPC's assets. In May 1999, DLJ recommended sale of all assets of the company, including the Chronicle. CPC's shareholders accepted DLJ's recommendation and engaged DLJ to find buyers for these assets. DLJ's Jill Greenthal took charge of the project. Before CPC contacted other prospective buyers, Hearst submitted a bid of $565 million for the Chronicle. DLJ rejected this bid and proceeded to circulate offering documents to prospective purchasers of CPC assets.

Three major publishing firms, each with adequate financial resources to be considered serious bidders, expressed interest in buying CPC's Chronicle assets. Knight–Ridder, publisher of the San Jose Mercury–News, Contra Costa Times and other newspapers, showed interest at the low to mid $400 million levels; Gannett, publisher of USA Today, the Marin Independent–Journal and other newspapers appeared willing to pay in the range of high $400 million to low $500 million; Times–Mirror, publisher of the Los Angeles Times and other newspapers, expressed an interest in about the same range and a willingness also to buy CPC's Bloomington and Worcester newspapers.

In June 1999, Hearst retained Wasserstein Parella & Co (WP), an investment banking firm, to negotiate on its behalf. WP apprised Bennack of the progress of its negotiations with DLJ. Consistent with Bennack's strategy of a quick and decisive move, Hearst submitted a bid of at least $150 million greater than any competing offer. As a result of negotiations conducted by DLJ and WP, the parties struck a deal whereby Hearst would acquire the Chronicle and CPC's interest in SFNA for a total of $660 million. Greenthal considered this a preemptive bid and recommended its approval and acceptance. CPC gave that approval and the parties formally entered into an agreement for sale of the Chronicle and CPC's interest in the JOA.

The parties announced this agreement on August 6, 1999. Hearst stated that upon consummation of the transaction, it would attempt to sell the Examiner, and if unsuccessful, cease publication of the Examiner.

## ANALYSIS OF THE CHRONICLE SALE

Although the precedent is scanty, antitrust analysis of mergers in the newspaper industry has focused on the failing company defense of *Citizen Publishing*. The defendants in the present case, in keeping with these antecedents, have directed their arguments to whether the Examiner is so debilitated that its acquisition cannot negatively affect competition, rather than mounting an exhaustive challenge to plaintiff's prima facie showing of undue concentration in the relevant market.

This is somewhat ironic. Changes in markets for information and advertising since 1965 raise serious questions about plaintiff's ability to make a prima facie showing. Since the inception of the JOA, the market power of a newspaper firm dominant in San Francisco has been drastically reduced by (1) a steep increase in available sources of information and advertising, such as radio, television and the Internet, and (2) the expansion of the geographic market in which the SFNA newspapers compete to include the eleven counties in the San Francisco Bay area.

Since inception of the JOA, the presence and importance of non-newspaper media in the market for information has exploded. In 1965, broadcasting outlets in metropolitan markets were few in number. San Francisco had four VHF TV stations, one of which was at the time of trial still owned by CPC. In 1965, UHF stations had relatively short reach and provided no effective competition for VHF stations. Radio was primarily on the AM band. FM stations were few in number and provided mostly programming of limited appeal (for example, classical music). Cable television was largely confined to rural areas, imported distant signals only rather than originating programming and carried little advertising. The Internet was science fiction in 1965.

In 1999, there were thirty-two AM stations, forty-three FM stations and twenty-eight television stations broadcasting in the San Francisco Bay area. Cable television imports a multitude of distant signals and provides a plethora of specialized cable programming and advertising.

The Internet has opened a staggering array of news sources. With relative ease, a person can select from a host of suppliers of newspaper-like news, features and opinions. Most major newspapers have web sites making it possible to access a substantial part of their content on line. An Internet user can design a unique individually tailored on-line newspaper by roaming all news content servers and selecting stories and subjects of interest. These new media provide new outlets for advertisers as well. "Banner" advertisements have become commonplace on news and shopping web sites.

Free-distribution newspapers and direct-mail advertising vehicles provide attractive alternatives to traditional newspaper advertising and have become numerous, leading to sidewalk clutter of such magnitude that it itself has become a political hot potato in San Francisco and elsewhere. In addition, there are many weekly newspapers that circulate in San Francisco and the surrounding counties and several alternative news weeklies (for example The Bay Guardian, San Francisco Business Times), ethnic publications (for example, Sun Reporter, Nishibei Times) and special interest publications (for example, Bay Area Reporter). The Fangs' Independent also competes with SFNA's newspapers for both readers and advertising.

Perhaps most significantly, with the growth in population and striking economic vitality of Santa Clara county, the San Jose Mercury–News poses a serious challenge to the market share of the San Francisco-based metropolitan dailies. The Mercury–News is a comprehensive widely circulated newspaper of high quality. Its inroads in the core circulation areas of the Chronicle and Examiner along the San Francisco peninsula and in southern Alameda county have been significant.

From its base in Santa Clara county, the Mercury–News rivals the Examiner's share of field in Alameda and San Mateo counties and substantially exceeds the shares of field of the Chronicle and Examiner in Santa Clara county. The Mercury–News has recently stepped up its efforts to compete in San Francisco. See Steve Rubenstein, *Mercury News' New Edition Hits Stands in 'Frisco'*, San Francisco Chronicle A18 (July 26, 2000).

The robust competition between the San Francisco dailies and the Mercury–News provides the best example of the market shift that has occurred since the inception of the JOA. In 1965, the geographic center of business activity in the San Francisco Bay area was San Francisco, and newspapers in outlying counties posed no significant threat to Hearst/CPC dominance. Since that year, population and economic growth outside San Francisco has been prodigious relative to that of San Francisco, upending the San Francisco-centric market paradigm.

While a merger of the two dominant San Francisco dailies in 1965 might well have posed an unquestionable threat of undue concentration of market power under the old paradigm, that threat today is far from clear. All of above-mentioned participants in the market for information and advertising have the actual and potential ability to deprive SFNA's newspapers of significant levels of business. The economic picture in the media industry is one of overlapping areas of competition, wherein each participant competes for consumers and advertisers but also possesses a discrete content or geography related "monopoly" over a subgroup of consumers and advertisers who, for a variety of reasons, insist on a particular media source. Media products, of course, are not fungible goods. Branding, technological preferences and consumer loyalty are important factors contributing to the quantum of market power that individual media sources possess. In sum, the high level of differentiation within the industry and the strong overlap in product and geographic markets described above results in a form of monopolistic competition. This economic dynamic has been recognized in the economic literature as characteristic of modern markets for nonfungible goods. See generally Edward H Chamberlain, The Theory of Monopolistic Competition (Harvard Univ Press 1933).

An industry exhibiting the characteristics of monopolistic competition, because of its mix of monopoly and competitive elements, does not lend itself well to traditional antitrust analysis, with its considerations of concentration of power in well-defined product and geographic markets. This, more than anything else, explains the focus of the parties and newspaper-merger precedent on the failing company defense. The court concludes that the most productive approach is one, as explained below, that assumes a threshold showing of concentration in the relevant market and examines the competitive effects of the merger in terms of the efficient allocation of resources.

In passing the NPA in 1970, the 91st Congress accepted the notion that "ruinous competition" works more harm than good in the newspaper business. Antitrust adjudicators had rejected that argument in finding a newspaper joint operating agreement illegal in *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). The newspaper industry fared better with legislators, who determined that the public interest in preserving editorial voices would be best served by permitting newspaper monopolies conditioned on maintenance of separate editorial functions.

Under *Citizen Publishing*, joint operating agreements such as the Hearst/CPC arrangement involving price fixing and profit pooling were illegal unless the participants could make out a "failing company" defense. This required a weighty showing that one of the businesses "is on the brink of collapse, its prospects for reorganization are dim or nonexistent, and no other noncompeting buyers are available." *Committee for an Independent P–I v. Hearst Corp.*, 704 F.2d 467, 474 (9th

Cir.1983) (characterizing *Citizen Publishing* formulation of failing company doctrine).

The NPA's antitrust exemptions expand the failing company defense in the newspaper context in order to (1) legalize existing JOAs and (2) make it easier for newspapers to enter JOAs. With respect to the goal of preserving existing JOAs, the NPA immunizes any JOA entered into prior to July 24, 1970, if at the time of its inception "not more than one of the newspaper publications involved in the performance of such arrangement was likely to remain or become a financially sound publication." 15 USC § 1803(a).

The original bill provided this expansive protection across the board, but legislative compromise resulted in a slimmer exemption for future JOA participants. Thus, the NPA requires a more stringent failing company showing for post-Act JOAs (in addition to requiring Justice department preclearance). As a prerequisite to approval, the Attorney General must determine that no more than one of the participants is not "in probable danger of financial failure." 15 USC §§ 1803(b), 1802(5). The more favorable treatment for pre-Act JOAs appears to reflect the legislative view that fairness issues counseled especially in favor of protecting established JOAs (there were 22 at the time of enactment). The prime concern was that such JOAs had received tacit approval through decades of government inaction. See, for example, Newspaper Preservation Act, Hearings on HR 279 before the Antitrust Subcommittee of the House Committee on the Judiciary, 91st Cong, 1st Sess 481–82 (comments of Chairman Celler) ("The indifference [of the government to JOAs] has lasted over a period of four decades. That lends encouragement to the proliferation of these joint agreements.").

As the foregoing illustrates, in enacting the NPA, Congress sought to identify the circumstances under which newspaper companies could *enter* a JOA. The instant case, of course, involves an attempt by JOA partners to unwind their arrangement. The NPA does not address antitrust issues arising from *termination* of a JOA. Ironically, however, since enactment of the NPA, there have been twice as many cases in which JOAs have terminated or the parties have ceased publication of more than one product (fifteen, although JOA termination occurred twice in Chattanooga) than cases in which competitors have entered into a JOA (seven, including the recently announced Denver agreement).

In the following cities, JOA partners have terminated their agreement and/or ceased publication of one of two JOA newspapers: Chattanooga, TN (first JOA) (1966); Anchorage, AK (1979); St Louis, MO (1983); Franklin–Oil City, PA (1985); Columbus, OH (1985); Miami, FL (1988); Shreveport, LA (1991); Knoxville, TN (1991); Tulsa, OK (1992); Pittsburgh, PA (1992); El Paso, TX (1997); Nashville, TN (1998); Evansville, IN (1998); Chattanooga, TN (second JOA) (1999) and Honolulu, HI (1999).

These cases resulted in very little antitrust enforcement activity or litigation, and did not produce a single published judicial opinion. DOJ did, however, in two cases provide its view of the relevant legal analysis governing an attempt by JOA partners to merge or cease publication of multiple products.

In November 1983, Assistant Attorney General William F Baxter, then head of the DOJ's antitrust division, issued a press release concerning the proposed merger of JOA publications in St Louis. The Pulitzer Publishing Company and Newhouse newspaper group had since 1961 maintained a joint operating agreement providing for profit pooling, joint production and joint printing of their respective dailies, the St Louis Post–Dispatch and the Globe–Democrat. The publishers had informed DOJ of their intent to discontinue publication of the Globe–Democrat and to continue jointly to publish the Post–Dispatch. Baxter explained that such an arrange-

ment would "end their existing exemption [under the NPA] from the antitrust laws" and proceeded to define the legal standard DOJ would apply to the transaction.

Although the Newspaper Preservation Act contains no provision addressed to the discontinuance of the existing joint operating arrangement, Baxter said the Act should not be read as requiring publishers who once obtain an exemption to continue their separate publications forever without regard to the magnitude of the financial losses involved. Baxter noted, however, that the NPA "could be abused if publishers were free first to eliminate commercial competition by entering a joint operating agreement in compliance with the Act and then to discontinue editorial competition by abandoning one of the two newspapers." This problem could be countered by application of the *Citizen Publishing* test to proposed newspaper mergers, Baxter said. "The Antitrust Division will * * * insist upon a rigorous application of the more demanding, traditional failing firm test whenever the parties to an existing joint operating agreement propose to discontinue one of the two newspapers." The press release described that test as requiring a showing "that the resources of the acquired firm are so depleted and its prospects for rehabilitation are so remote that it faces the probability of business failure and that there are no prospective purchasers."

Subsequent to the DOJ press release, Newhouse sold assets relating to the Globe–Democrat. The paper folded within two years.

In a case even more directly analogous to the case at bar, DOJ made clear in a 1985 business review letter to JOA publishers in Franklin–Oil City, PA, that the analysis set forth in the Baxter press release applied to the proposed acquisition of one JOA partner by another. The Franklin News Herald and the Oil City Derrick had been published since 1959 under a joint operating agreement between News–Herald Printing Company and Derrick Publishing Company. The publishers informed DOJ of the proposed acquisition of News–Herald by Derrick and concurrent termination of the JOA. In response, acting Assistant Attorney General Charles F Rule (applying the Baxter analysis) conducted an investigation of the viability of the Derrick outside the JOA and assessed Derrick's sales efforts and concluded that it would not take enforcement action.

The DOJ statements from AAGs Baxter and Rule provide the proper framework for analysis in the present case. They represent, in effect, the unremarkable position that a transaction terminating a JOA is subject to ordinary antitrust scrutiny. The very nature of such a transaction makes clear that the parties are not seeking to avail themselves of the NPA's antitrust exemptions. Although inartful drafting of the NPA leaves open the argument that termination of a JOA is exempt from antitrust scrutiny as an amendment to the agreement, the defendants here, quite sensibly, have not advanced this argument.

The court concludes that in an antitrust challenge to a proposed merger of JOA newspapers, the defendants may avoid liability by proving the traditional failing company defense of *Citizen Publishing.* Broadly stated, this requires a showing that: (1) one of the newspapers would be a failing company if operated outside the JOA; and (2) there are no alternative purchasers willing to operate the newspaper outside the JOA.

According to the standard enunciated in *Citizen Publishing,* a failing company is one whose "resources are so depleted and the prospects of rehabilitation so remote that it faces grave probability of business failure." 394 U.S. at 137, 89 S.Ct. 927 (internal citation omitted). In the context of a joint operating agreement, where costs are revenues are intermingled between two products performing at different levels, this question is not simple. It involves speculation about future costs and revenues arising from operation under changed circumstances and consideration

of the peculiar economics of the newspaper business described above.

Defendants presented two forms of evidence regarding the economic viability of the Examiner. First, defendants offered a pro forma financial analysis using cost and revenue data for SFNA from 1998 and attributing to the Examiner a share of SFNA revenue equivalent to its share of total circulation (20 percent). Under these projections (which incorporate financial assumptions favorable to the Examiner), a stand-alone Examiner in 1998 would have earned $91,828,859 in revenue and incurred $124,988,018 in costs, for a net loss of $33,159,160.

These figures make a compelling case that the Examiner is a failing company. To be sure, many firms remain in business even when they sustain losses, but when the cost of securing a dollar of marginal revenue exceeds that dollar, the rational course is to reduce output to a level consistent with revenue prospects. Only if there is a prospect of recovering present losses through future profits can a rational firm continue to incur the loss.

In this case, the evidence establishes that the Examiner, operating as a general circulation metropolitan daily and Sunday newspaper outside the JOA and independent of the Chronicle, would have to overcome a 4:1 circulation disadvantage to achieve not only future profitability, but profitability sufficient to recoup any losses that Hearst would incur during the period of losses. A circulation disadvantage of this magnitude is considerably greater than that which Hearst or any commercially motivated publisher could surmount to achieve profitability.

Such evidence was not contested by plaintiff to any significant degree. Plaintiff's expert witnesses testified about redirecting the Examiner editorial product or circulation pattern in various ways to secure sound economic footing, but their testimony was highly speculative and anecdotal, not backed by serious market analysis, leaving the court unconvinced. Any argument that plaintiff might advance regarding the viability of a stand-alone Examiner is completely undercut by his insistence in his negotiations with Hearst for a large subsidy to take the Examiner off Hearst's hands. Accordingly, the court finds that as a stand-alone metropolitan daily, the Examiner's prospects of survival are extremely remote.

The second form of evidence presented by defendants approaches the question in a different way. Rather than attempting to model the performance of a stand-alone Examiner based on some percentage of current operating costs and revenues of SFNA, the second approach assesses the value of the Examiner to the joint enterprise as a whole. If continued publication of the Examiner does not make a net contribution to the joint profits of the enterprise, the argument runs, principles of allocative efficiency dictate that the Examiner should be closed. Under this analysis, a failing JOA newspaper is one whose incremental costs exceed the incremental revenues attributable to its operation within the JOA.

This test is consistent with that articulated in *Citizen Publishing*, since "a grave probability of business failure" for a particular product within a larger enterprise exists when the incremental costs of continuing that product exceed the incremental revenues it generates for the operation. Indeed, in another currently pending case involving JOA termination, DOJ has indicated that analysis of incremental costs and revenues is an appropriate test of the viability of an allegedly failing JOA newspaper. See Brief Amicus Curie of the United States at 23, n15, filed in *Hawaii v. Gannett Pacific Corp*, No 99–17201 (9th Cir) ("[A] decision to terminate a newspaper whose incremental costs exceed the incremental revenues attributable to its operation is unlikely to violate the antitrust laws.").

The most reliable evidence at trial on this question came from defendants' expert, James N Rosse, who calculated the change in JOA profits that would result

from closing the Examiner, using a conservative estimate of retained circulation of 40,000. From 1999 financial data, the following picture emerged: circulation declines would result in a $26,392,069 decrease in total revenue, while savings in printing, production, circulation resulted in a decrease of $30,792,573 in SFNA expenses and elimination of Examiner editorial costs resulted in a decrease of $17,320,263 in non-agency expenses. The net effect on profit to the enterprise was a gain of $21,720,767 from closure of the Examiner. This evidence establishes that the Examiner imposes a substantial drain on the profitability of the JOA enterprise as a whole.

From defendants' showing the court concludes that the first prong of the *Citizen Publishing* failing company test has been met. Defendant's financial estimates, while obviously containing some speculation, employ conservative assumptions and present a realistic reflection of the Examiner's economic prospects. Rosse's testimony was essentially unrebutted. These projections establish that the Examiner is not economically viable either as a stand-alone product or part of the joint enterprise.

*Citizen Publishing* also establishes a "no alternative purchaser" prong of the failing company defense. This prong supplements analysis of financial data by testing the viability of the alleged failing newspaper in the market. If an alternative purchaser can be found for the allegedly failing JOA product (1) the product is presumably economically viable and (2) the sale will be preferable to its closure because a competitor will be preserved rather than eliminated.

In July 1999 and January 2000, Hearst conducted two major sales efforts of Examiner assets through its broker, Veronis Suhler & Associates, a media investment banking firm. The July 1999 offer included the Examiner name, editorial equipment, racks, archives, the opportunity to employ editorial staff and a transitional agreement for production and distribution.

The January 2000 offer added printing and distribution assets sufficient to enable a buyer to commence publication of the Examiner on a "turnkey" basis. Veronis Suhler announced the offers publicly and contacted directly 91 prospective purchasers (newspaper publishers, media groups and wealthy individuals). These efforts produced no buyer willing to pay a positive purchase price.

The court concludes that Hearst's attempts to find an alternative purchaser for Examiner assets satisfy the test of *Citizen Publishing*. Although Hearst never offered a position in the JOA, nothing in that case or the Baxter–Rule interpretations of it required Hearst to do so. Common sense and antitrust policy strongly support this approach. Requiring a JOA party to bring in a new party in place of an existing JOA party does nothing to advance competition. As noted above, the operative question is and should be whether an alternative purchaser is willing to operate the newspaper in question *outside* the JOA. The evidence clearly establishes that, insofar as the only "offers" for the Examiner involved substantial subsidies by Hearst, none of those offers undermines the conclusion that the Examiner is a failing company.

In sum, the evidence at trial establishes that the Examiner is a failing company within the meaning of the *Citizen Publishing* test. Therefore, the parties to the San Francisco JOA lawfully may merge and cease publication of the Examiner. Indeed, the evidence presented strongly supports the conclusion that this result is economically efficient and otherwise in the public interest.

### THE FANG DEAL

■ The court has to this point addressed the legality of Hearst's proposed acquisition of the Chronicle independent of the transfer of Examiner assets to the Fang group. Although the transactions are related, they call for separate analysis for the following reasons. First, legality

of the August 6 transaction is a threshold issue: if Hearst may lawfully acquire Chronicle and close the Examiner (as the court has concluded it may), the Fang transaction is obviously not dictated by antitrust law. Second, as the discussion of the facts leading to its consummation reveals, the Fang transaction was not contemplated by Hearst and CPC and does not constitute a part of their original deal. It follows that the particular circumstances and antitrust ramifications of the Fang transaction merit independent scrutiny.

With an agreement for the purchase and sale of the Chronicle reached, the parties faced two serious and related obstacles to completing the transaction. An acquisition of the size proposed would require regulatory clearance pursuant to 15 USC § 18a. And due to the symbiotic relationship between local newspapers and local politics, the parties anticipated their deal would face significant political scrutiny and, perhaps, significant opposition. Such concerns were well founded in the parties' prior experience. In May 1996, when premature published reports had appeared about Hearst's possible acquisition of the Chronicle, Willie L Brown Jr, mayor of San Francisco, wrote to Attorney General Janet Reno expressing concern about the rumored transaction.

Hearst believed that an effort to sell the Examiner would aid it in gaining regulatory and public approval of the Chronicle acquisition. On July 30, 1999, Hearst retained Veronis Suhler & Associates to represent Hearst in seeking a buyer for the Examiner as a stand-alone newspaper. Veronis Suhler conducted an initial offering of a package of Examiner assets, including the masthead and some publishing equipment.

On July 28, 1999, while DLJ and WP were working out the details of what became the August 6 agreement, White met with Mayor Brown to discuss Hearst's possible acquisition of the Chronicle. After this meeting, White reported to his superiors at Hearst that he had pitched Brown extensively for his support. According to White's report to his superiors, Mayor Brown said that if Hearst wished to avoid problems with city government Hearst should settle outstanding litigation with the Fang group over allegations of predatory pricing. Such litigation could have "funny undesired consequences * * * even if one thing has nothing to do with the other."

The Fangs are important political allies of the mayor and have supported his endeavors in the pages of the Independent and through other campaign efforts. On July 29, 1999, White advised Mayor Brown that Hearst would be pleased to meet with Florence Fang at any time and any place.

On August 6, 1999, the day Hearst announced the proposed Chronicle acquisition, Bennack and other senior Hearst officials, including White, met with Mayor Brown in San Francisco. Also on that day, Hearst informally notified the United States Department of Justice, Antitrust Division (DOJ), of the transaction.

On August 20, 1999, Mayor Brown wrote Attorney General Reno that early termination of the JOA would result in closing the Examiner and threaten San Francisco's third newspaper. Hearst interpreted the reference to the third newspaper to mean Fang's Independent. Copies of this letter were sent to other Congressional representatives from the San Francisco Bay area, including Senator Dianne Feinstein, a former mayor of San Francisco, long-time member of the city's board of supervisors and a member of the Senate Judiciary Committee, which oversees DOJ.

On August 30, 1999, White and Examiner editor Phil Bronstein met with Mayor Brown. At the time, Mayor Brown was a candidate for re-election. On the day of this meeting, White e-mailed George Irish, president of Hearst's newspaper division, that he had asked Brown how White could justify to his superiors in New York wanting to support Brown when the mayor seemed to go out of his way to make life difficult for Hearst. According to White, Brown replied that he was doing no more

than was politically minimally necessary to placate the board of supervisors and other constituents, and that Attorney General Reno had told him there would be no hearings on Hearst's acquisition of the Chronicle. White's e-mail was forwarded the next day to Bennack, Hearst's chief legal officer James Asher and Hearst's counsel.

In a telephone conversation following the August 30 meeting, White told Irish that at the meeting Mayor Brown brought up the subject of the Examiner's critical coverage of San Francisco's minority contracting program, a project strongly supported by the mayor. White reported that he made clear to Mayor Brown that the newspaper's editorial treatment of Brown would ease off if he supported Hearst's acquisition of the Chronicle. White offered to "horse trade" favorable editorial coverage of the mayor in return for Brown's support. White reported that Mayor Brown said that he and other city officials would not be a problem for Hearst. According to White, the mayor mentioned that the city attorney's investigation into the Chronicle purchase had been assigned to a "lightweight," someone not likely to lead a charge on a major issue.

Irish and Bennack were aware of White's overtures to "horse trade" favorable editorial coverage in exchange for Brown's support of Hearst's Chronicle acquisition at the time, or shortly after, White made them. In their testimony, Irish and Bennack denied knowing of White's overtures to Brown until White testified about them in trial on May 1, 2000. These denials are not credible and the court does not believe them for the following reasons: (1) Irish and Bennack received e-mails from White describing his conversations with Brown; (2) Hearst's acquisition of the Chronicle was an important business objective of Bennack and Irish and it is probable that they would have paid close attention to White's reports of his efforts to enlist local politicians to support Hearst's acquisition; (3) the demeanor of Bennack and Irish on the

witness stand suggests that their testimony in this regard was not forthright—this is particularly true of Irish who simply was not a believable witness in this aspect of his testimony—and (4) White's rather forthright testimony and demeanor on the witness stand with respect to his overtures to trade editorial coverage for Brown's support suggest that White did not expect such testimony would come as a surprise to his superiors or that his superiors would not corroborate his statements.

On October 19, 1999, White reported to Irish that Mayor Brown's campaign consultant and "consiglieri to the Fangs" was speculating on litigation to tie up Hearst's acquisition of the Chronicle for years.

Hearst officials were of the view that, irrespective of the strength of Hearst's legal position, the mayor and other local political figures could at the very least significantly delay the Chronicle acquisition and perhaps derail the deal altogether. These concerns were based not only on the ability of local politicians to shape public opinion and to initiate legal proceedings but also on the perceived influence of such officials, Brown and Feinstein in particular, over the direction of the DOJ investigation. Hearst decided that efforts to curry favor with the mayor should be a top priority. The offer to "horse trade" favorable coverage was the start, but not the end, of such efforts.

In its initial correspondence to DOJ, on September 23, 1999, Hearst presented an exhaustive survey of the circumstances surrounding previous JOA terminations in 14 cities and the position (if any) of DOJ in those cases. Hearst concluded that the Chronicle acquisition raised no antitrust concerns and urged DOJ to grant a request for early termination of the waiting period prescribed by pre-merger approval rules.

In dealing with DOJ, Hearst was handicapped by a lack of binding precedent and a loose statutory framework that vests in DOJ broad authority without setting enforcement standards. Hearst was forced

to derive its legal arguments from informal agency documents and press releases. DOJ expanded and continued its investigation without providing any legal basis for its concerns.

On October 15, 1999, DOJ made a second request to Hearst for information about acquisition of the Chronicle. This request was extremely burdensome and entailed time-consuming responses, and appears to have called for a great deal of information irrelevant to Hearst's effort to acquire the Chronicle or to any economic or antitrust issues that this acquisition might raise. The request was a significant setback for Hearst and reinforced Hearst's belief that, no matter how persuasive its legal arguments, the Chronicle transaction was subject to deal-threatening delay at the whim of DOJ and local politicians.

On December 2, 1999, Hearst's Asher received a telephone call from the Fangs' lawyer offering to take the Examiner off Hearst's hands if Hearst would provide a cash subsidy of $35 million for five years and promised not to engage in distribution of free newspapers. According to Asher, the attorney said the Fangs would use their extensive political connections to assist in completing Hearst's purchase of the Chronicle.

By late 1999, DOJ had communicated to Hearst that it favored an aggressive effort to sell the Examiner as a going concern with Hearst's full interest in the JOA as the best test for whether the Examiner could be considered a failing company. DOJ provided no legal justification for its position or its rejection of Hearst's arguments that a sales effort was unnecessary.

Hearst instructed Veronis Suhler to make a second offering of Examiner assets. The offer included all assets previously offered plus Hearst's San Francisco printing plant. Hearst did not offer its interest in the JOA.

Three parties expressed an interest in this enhanced package of Examiner assets and in undertaking publication of a newspaper: plaintiff, the Fang group and Leucadia, a New York distressed finance company. Each party, however, requested either participation in the JOA or some form of subsidy from Hearst. Hearst received no offer at or above liquidation value.

At his inaugural address on January 8, 2000, Mayor Brown expressed displeasure about a "quick marriage of our two daily newspapers." Brown stated: "Let's let [Hearst] have the Chronicle, maybe it will make it a better paper, who knows. But let them have the Chronicle. But leave the Examiner as a civic treasure for us." The mayor then urged formation of a group to buy the Examiner.

Hearst concluded that its efforts to persuade Mayor Brown to drop his opposition to an Examiner shutdown, including the offer to trade favorable editorial coverage, were failing. Hearst decided that given Mayor Brown's earlier public expressions of concern about Hearst's purchase of the Chronicle, a "sale" of the Examiner was necessary to allow the mayor to save face and that only a "sale" to a buyer favored by the mayor would engender his support for Hearst's acquisition of the Chronicle.

Hearst also concluded that San Francisco political figures were influencing the course of DOJ's investigation and that Brown's support was crucial to obtaining DOJ clearance for the Chronicle acquisition.

On January 21, 2000, White met with Florence Fang and Senator Feinstein. White and Fang discussed the possibility of Fang publishing a daily newspaper under the Examiner banner.

In a February 24, 2000, meeting with DOJ investigators, Hearst again pressed its argument that the Examiner was a failing company and that it therefore could be removed from the market without injury to competition. Hearst cited the results of its second offering of Examiner assets, which failed to produce a bid at or above liquidation value. DOJ declined to accept Hearst's arguments or characterization of the offers received.

On March 16, 2000, Hearst entered into a contract involving a transfer of Examiner assets to ExIn. The contract calls for Hearst to subsidize up to $66 million of the Examiner's operating costs for a three-year period. Under this arrangement, the Fang group will not have to invest its own capital to run the Examiner, and the Fang group does not intend to put any of its own money into covering losses incurred in publishing the Examiner. Allowable expenses include an annual salary to Ted Fang of $500,000.

Under ExIn management, the Examiner will be a paid, six-day-a-week morning newspaper circulating primarily in San Francisco and, to a limited extent, parts of San Mateo county. The Examiner will be substantially reduced in the scope of its coverage and will focus almost exclusively on local coverage of San Francisco. ExIn anticipates a circulation of 50,000–75,000.

In the course of DOJ's investigation, Hearst took the position that to be "fully competitive," a competing newspaper would need to have approximately the same circulation as the Chronicle, that is, about 475,000 daily and 590,000 Sunday. Hearst represented in its Hart–Scott–Rodino submission to DOJ that a fully competing metropolitan newspaper could not survive with less than 300,000 daily and 400,000 Sunday circulation. At least as early as the public announcement of the March 16 transaction, Hearst knew that ExIn did not intend to produce a "fully competitive" newspaper as Hearst had used that term with DOJ.

Hearst has no economic reason or justification for the March 16 contract except its belief that this transaction was necessary to shake loose political and regulatory approval of the August 6 transaction.

On March 30, 2000, two weeks after announcement of the Hearst–ExIn agreement, DOJ issued a press release stating that the spin off of Examiner assets to ExIn resolved DOJ's antitrust "concerns" and that the newspaper contemplated by ExIn would restore "full competition" to the San Francisco newspaper market for the first time in thirty-five years. With respect to the competitive effect of the transaction, DOJ's press release was highly problematic.

## ANALYSIS OF THE FANG TRANSACTION

At the beginning of this case, Hearst's counsel candidly admitted that the Fang transaction was the product of politics. On the merits of the deal, the evidence is clear: the Fang transaction is grossly inefficient and probably anticompetitive. The Fangs would not undertake publication of the Examiner without the $66 million subsidy provided by Hearst under the March 16 agreement. That $66 million is a capital investment that the competitive market does not support, since no prospective Examiner purchaser was willing to make it. Moreover, Hearst's proposed subsidy would appear to create a barrier to entry by non-subsidized competitors of the contemplated Examiner by infusing that paper with cash untethered to performance. Presence of an artificially strong Examiner in the market for daily and weekly newspapers with a San Francisco focus would impair the ability of established participants to compete in that localized market. Furthermore, Hearst undoubtedly will attempt to recover the subsidy it is obligated to pay the Fang group through higher advertising rates in the Chronicle. With these facts, a persuasive case might be made that the March 16 transaction violates the antitrust laws.

But this conclusion cannot be predicated on the record of the present proceedings, and the court is presently unable to do more than identify the malodorous aspects of the Fang transaction. That is because plaintiff does not have standing to challenge the transaction on the grounds identified. An antitrust challenge to a transaction propping up a competitor with a subsidy cannot be brought by a plaintiff who demanded an even greater subsidy. Reilly's insistence on a larger subsidy than the Fangs eliminates the factual basis for

Reilly's standing as a potential purchaser of the Examiner. Reilly will not suffer injury in fact due to lessened competition attributable to the March 16 agreement because he is unwilling to enter into publication of a competing newspaper on terms less onerous than those imposed by Hearst's obligations to the Fangs under that agreement.

Hearst, which undisputedly has suffered injury as a result of being compelled to enter the Fang transaction, is not seeking relief from it. This, no doubt, reflects a tactical decision to put this incident behind it rather than to call attention to its own role in a checkered transaction.

Deeply troubling is the obvious tension between the court's conclusions from the evidence and the position of DOJ, implied in its March 30 press release and made explicit in post-trial submissions to the court, that its decision not to challenge the Hearst/Chronicle deal was contingent upon the Fang transaction. Insofar as the court has adopted analysis provided by the department in earlier JOA termination cases, the court was especially concerned to understand the legal basis for DOJ's position. To this end, the court invited DOJ to intervene in this case or file an amicus brief—an invitation the department declined. Nor in its submissions did DOJ provide any legal analysis in support of its antitrust "concerns" about the August 6 transaction, failing to so much as mention the standard applied in earlier JOA termination cases.

To their great credit, AAGs Baxter and Rule afforded a principled explanation for the DOJ position in St. Louis and Oil City. In the press release and business review letter cited above, DOJ set forward a legal framework for analysis of JOA terminations and mergers of JOA publications, which the court has adopted in this case. From DOJ's amicus brief in the pending case involving a JOA in Hawaii, in which DOJ stated that "a decision to terminate a newspaper whose incremental costs exceed the incremental revenues attributable to its operation is unlikely to violate the anti-trust laws," DOJ expressed a legal opinion in keeping with the failing company analysis provided by AAGs Baxter and Rule.

In this case, however, DOJ appears inexplicably to have departed from the Baxter–Rule approach. In DOJ's initial post-trial submission, the lead investigator of the Hearst deal stated that DOJ viewed "an attempt to sell Hearst's full interest in the JOA as an appropriate test of the Examiner's viability." As the court has already explained, this test is inconsistent with the idea that the "alternative purchaser" prong of *Citizen Publishing* requires a JOA publisher to seek a buyer willing to operate the newspaper *outside* the JOA.

Just as the court cannot discern the legal basis for DOJ's opposition to Hearst's acquisition of the Chronicle, it is unable to find any principled reason for DOJ's apparent faith in the competitive merits of the Fang transaction. Here, DOJ's failure to provide legal analysis is similarly glaring.

According to its March 30 press release, DOJ concluded that the Fang transaction would bestow upon advertisers and readers "the benefits of full competition" for the first time in 35 years. This statement is simply irreconcilable with the evidence before the court. As explained above: (1) the Fang transaction is not a sale but a heavily subsidized transfer; and (2) the Examiner contemplated by the Fangs will not result in anything close to "full competition" with the Chronicle.

Indeed, DOJ has backed off its March 30 statement in its post-trial submissions to the court, noting that it did not decide whether the Examiner sale was below liquidation value and determined only that the Fangs' Examiner "would adequately substitute for any competition likely to be lost as a result" of the sale of the Chronicle to Hearst. This latter position, of course, admits of the possibility that the Chronicle/Hearst transaction will result in *no* loss of competition.

The court is deeply troubled by DOJ's role in this case. Both of DOJ's key positions, that the Hearst/Chronicle merger created antitrust concerns and that the Fang transaction resolved those concerns, are unsupported by legal analysis and inconsistent with the evidence. DOJ has avoided explaining its apparent departure from its own approach in earlier JOA investigations, the legal basis for a burdensome and protracted investigation or the sudden approval of the Chronicle acquisition after Hearst agreed to provide a heavily-subsidized Examiner to political allies of the mayor of San Francisco.

These observations lead the court to the uneasy inference that the cronyism that fueled the Fang transaction at the local level also exerted influence over the DOJ investigation. At the very least, DOJ's sanction of the Fang transaction and the timing of that sanction, the now-abandoned characterization of the proposed Fang publication as "fully competitive" and DOJ's unwillingness to offer a legal analysis in support of its position significantly erodes the court's confidence in the impartiality and probity of DOJ's review of the transactions at bar. Hearst attributes the conduct of DOJ's investigation to lack of knowledge and inexperience in the newspaper industry of the DOJ personnel reviewing the transaction. While that explanation is troubling enough, less forgiving explanations come easily to mind. The undersigned is astonished and disappointed that DOJ would allow itself to be put in a position where the inference can be so easily drawn that its action or inaction in this case was political favoritism masquerading as law enforcement.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and over the subject matter of the action.

2. Plaintiff has standing to assert a claim for injury as a consumer of newspaper news, features and opinion, but lacks standing to sue for injury as an advertiser or a potential competitor in the publication of newspapers.

3. The 1965 joint operating agreement between Hearst and CPC constituted a price fixing, profit pooling and market allocation agreement in probable violation of the antitrust laws under then-existing market conditions.

4. The probable violation described above became exempt from antitrust enforcement with enactment of the Newspaper Preservation Act of 1970.

5. The NPA does not require publishers who once operate under the NPA's exemption to continue their separate publications indefinitely or for the contemplated period of the JOA.

6. Parties to a JOA may lawfully merge and cease publication of one of the JOA newspapers if that newspaper meets the failing company standard of *Citizen Publishing Co. v. United States*, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969). When that test is met, the parties to a JOA may discontinue the failing publication and may dispose of the assets associated with it; neither the NPA or any other antitrust law requires the parties to ensure that some other competing publication comes into existence; nor do JOA participants have a legal obligation to spin off some of the JOA's assets to a third party for purposes of establishing a competitor.

7. Merger of Hearst and CPC operations coupled with the closure of the Examiner would not create a monopoly, substantially lessen competition or unreasonably restrain trade. Accordingly, the August 6 contract does not violate sections 1 or 2 of the Sherman Act or section 7 of the Clayton Act.

8. Closure of the Examiner without a spin off of assets as contemplated in the March 16 contract would increase allocative efficiency in that it would afford the same outlet for advertisers that both the Chronicle and Examiner now provide and conserve substantial resources, while lessening the content choice available to newspaper readers only negligibly.

9. The arrangements between Hearst and ExIn contemplated in the March 16 contract appear inimical to competition and could constitute a violation of the anti-trust laws.

10. Plaintiff does not have standing to challenge this aspect of the March 16 transaction. Plaintiff's standing is limited to that of a consumer of newspaper news, features and opinion; his alleged injury is the loss of an economically viable editorial voice. With the court's conclusion that closure of the Examiner may proceed without a sale to the Fang group or any other party unwilling to pay at least liquidation value for Examiner assets, such injury does not in this instance exist and plaintiff's cause of action fails. In order to challenge the March 16 transaction on the basis of possible anticompetitive effects, a plaintiff would need standing as an advertiser in or competitor to Hearst or Fang group publications, or both.

11. Although plaintiff did not prevail in obtaining the relief he sought, his action has served a useful purpose in bringing to light problematic conduct of the government and the parties. The court will entertain a motion to award plaintiff for his fees and costs of suit pursuant to sections 4 and 16 of the Clayton Act, 15 USC §§ 15, 26.

IT IS SO ORDERED.