CONLEY PUBLISHING GROUP LTD., Freeman Newspapers LLC and Lakeshore Newspapers, Inc., Plaintiffs-Appellants,

v.

JOURNAL COMMUNICATIONS, INC., and Journal Sentinel, Inc., Defendants-Respondents.

Supreme Court

*No. 01–3128. Oral argument February 11, 2003.—Decided July 17, 2003.*

2003 WI 119

(Also reported in 665 N.W.2d 879.)

For the plaintiffs-appellants there were briefs by *W. Stuart Parsons, Brian D. Winters, Steven J. Berryman, Robert J. Pluta,* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *Steven J. Berryman.*

For the defendants-respondents there was a brief by *John R. Dawson, James T. McKeown, G. Michael Halfenger, Paul Bargren,* and *Foley & Lardner,* Milwaukee, and oral argument by *John R. Dawson.*

An amicus curiae brief was filed by *Robert H. Friebert, Matthew W. O'Neill,* and *Friebert, Finerty & St. John, S.C.,* Milwaukee, and *Anne Berlemann Kearney, Joseph D. Kearney,* and *Appellate Consulting Group,* Milwaukee, on behalf of the Wisconsin Utilities Association.

An amicus curiae brief was filed by *Daniel Blinka,* Milwaukee, *William C. Gleisner, III,* Madison, and *R. George Burnett* and *Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, on behalf of the Wisconsin Academy of Trial Lawyers.

¶ 1. DAVID T. PROSSER, J. This case involves allegations of predatory pricing by one Wisconsin newspaper against another. The Circuit Court for Waukesha County, Donald J. Hassin, Judge, dismissed the antitrust claims of Conley Publishing Group Ltd., et al., (Conley) against Journal Communications, Inc., and Journal Sentinel, Inc., (collectively, the Journal) and granted the defendants summary judgment. Conley appealed. The case is now before us on certification from the court of appeals, pursuant to Wis. Stat. (Rule) § 809.61 (2001–02).[1]

¶ 2. The court of appeals has certified three issues for our review. First, should the United States Supreme Court decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209 (1993), be adopted as the law in Wisconsin governing predatory pricing under Wis. Stat. § 133.03? Second, does the federal rule governing the admissibility of expert opinion testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993)—an evidentiary rule we have not adopted in Wisconsin—affect the applicability of *Brooke Group* to Wisconsin law? Third, does Wisconsin's predatory pricing law require a plaintiff to "disaggregate" its damages in order to survive summary judgment?

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 3. We hold that a claim of predatory pricing under Wis. Stat. § 133.03 must conform to the requirements established in *Brooke Group* for similar claims under Section 2 of the federal Sherman Antitrust Act. A plaintiff alleging that a defendant engaged in predatory pricing must prove that (1) the prices and other direct revenues from the practice complained of are below an appropriate measure of the defendant's costs; and (2) the defendant has a dangerous probability of recouping its investment "losses" in these below-cost prices by later raising prices above competitive levels. Applying these standards, we conclude that the plaintiffs have not presented sufficient evidence to permit a reasonable jury to conclude that the Journal either engaged in below-cost pricing or, assuming that it did, that there is a dangerous probability of the Journal recouping the losses that it may have incurred from its Sunday-daily conversion program. Accordingly, we affirm the circuit court's decision to grant summary judgment.

¶ 4. Because the plaintiffs' action fails to survive summary judgment on these grounds, we need not address whether the circuit court properly granted summary judgment on the issue of causation, either on the basis of insufficient evidence or on the basis of plaintiffs' failure to "disaggregate" their damages. Finally, because the parties to this action have not contested the admissibility of any expert's opinion, we decline to reevaluate, at this time, the standard for admitting expert testimony under Wis. Stat. § 907.02.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

¶ 5. The *Waukesha Freeman* is a paid, daily newspaper that was founded in 1859. It is distributed to

residents of Waukesha County as an afternoon paper Monday through Friday. There is also a Saturday morning edition but no Sunday newspaper. While the *Freeman* provides coverage of state, national, and international news, its primary focus is on the Waukesha community.

¶ 6. The *Freeman*'s only competitor in the Waukesha County paid daily newspaper market is the *Milwaukee Journal Sentinel* (the *Journal Sentinel*). As of 2000, when this suit was filed, the *Journal Sentinel* controlled roughly 78% of the daily newspaper readership market in Waukesha County, while the *Freeman* controlled roughly 22%. In 1996 the *Freeman* had 28% of the market.

¶ 7. The *Journal Sentinel* is distributed throughout southeastern Wisconsin and, to a lesser extent, the rest of Wisconsin, and its daily edition is the only local paid daily newspaper in some southeastern Wisconsin counties, including Milwaukee County. Unlike the *Freeman,* the *Journal Sentinel* has a Sunday edition, which is the only local paid Sunday newspaper in Milwaukee, Ozaukee, and Waukesha Counties.

¶ 8. In August 2000 Conley Publishing Group, Ltd., Freeman Newspapers, LLC, and Lakeshore Newspapers, Inc.,[2] filed this action against Journal Sentinel, Inc., the publisher of the *Journal Sentinel,* and Journal Communications, Inc.[3] In its second amended complaint, Conley alleged that the Journal was monopoliz-

---

[2] Conley Publishing has published the *Freeman* since it purchased the newspaper in May 1997. Throughout this opinion we will refer to the plaintiffs collectively as "Conley," unless otherwise indicated.

[3] Journal Sentinel, Inc., is a wholly owned subsidary of Journal Communications, Inc. The *Milwaukee Journal Sentinel* was formed as the result of the April 1995 merger of Wisconsin's

ing or attempting to monopolize the market for reader-ship of paid daily newspapers in Waukesha County in violation of Wisconsin's Antitrust Act, Chapter 133 of the Wisconsin Statutes. Relevant to this appeal are Conley's claims that the Journal engaged in predatory pricing of its newspapers in order to drive the *Freeman* out of business.

¶ 9. In particular, Conley alleged that, beginning in the middle of 1996, the Journal began targeting subscribers to the *Freeman* by offering a "Sunday-daily conversion program." This conversion program, which is the basis of Conley's predatory pricing claim, oper-ated as follows. The Journal hired a marketing com-pany to contact residents of Waukesha County who subscribed to the Sunday edition of the *Journal Senti-nel* but not to the daily *Journal Sentinel.* These resi-dents included subscribers who received the *Freeman* during the week as well as subscribers who received no local daily newspaper. The Journal then offered these Sunday subscribers the opportunity to receive the daily *Journal Sentinel* at no additional cost for the remainder of their Sunday *Journal Sentinel* contract, provided that the subscribers shortened the length of their Sunday subscription. For example, the Journal would offer a 52–week Sunday-only subscriber up to 49 weeks of the daily *Journal Sentinel* at no additional cost, if the subscriber agreed to shorten the existing Sunday sub-scription term to 49 weeks.[4]

---

two largest newspapers, the *Milwaukee Journal* (an afternoon daily) and the *Milwaukee Sentinel* (a morning daily).

[4] Similar plans were offered to other Sunday-only subscrib-ers based on their current contract length. Thirteen-week and 26–week subscribers could covert to Monday through Sunday service by reducing their contact terms to 9 and 23 weeks, respectively.

¶ 10. During the period that the conversion program was offered, the *Freeman*'s circulation declined. According to the *Freeman*'s publisher, during the 10 years prior to 1996, the *Freeman*'s circulation remained relatively constant at around 22,000 subscribers. By the end of 1997, however, the *Freeman*'s circulation had dropped to 17,466, down 3,958 from the beginning of 1996. In 1998, the only year that the Journal did not offer a Sunday-conversion program in Waukesha County, the *Freeman* gained a marginal number (91) of subscribers. As of June 11, 2001, the *Freeman* had a circulation of approximately 15,900 subscribers. The *Freeman*'s decline in circulation led to a loss in subscription and advertising revenue. Conley quantifies these losses at somewhere between $1,108,800 and $3,853,067 from the time it acquired the *Freeman* in 1997 until the dismissal of its action.[5]

¶ 11. The Journal eventually filed a motion for summary judgment, which the circuit court granted on October 12, 2001. The court's ruling was based on its determination that Conley had failed to provide sufficient evidence to raise a genuine issue of material fact supporting (1) its predatory pricing claim; (2) a finding that the Journal's conduct caused the *Freeman*'s loss or injury; and (3) a finding on the amount of damages attributable to the Journal's alleged anticompetitive behavior. Conley appealed, arguing that it had offered sufficient evidence for the case to survive summary judgment. The court of appeals certified the appeal to this court.

¶ 12. Additional relevant facts will be presented as needed throughout this opinion.

---

[5] One of Conley's damages experts estimated the *Freeman*'s losses from the program to be $1,560,345.

## II. STANDARD OF REVIEW

¶ 13. We review a grant of summary judgment applying the same methodology as the circuit court. *Robinson v. City of W. Allis,* 2000 WI 126, ¶ 26, 239 Wis. 2d 595, 619 N.W.2d 692. Although our review is de novo, we benefit from the circuit court's analysis. *See Yahnke v. Carson,* 2000 WI 74, ¶ 10, 236 Wis. 2d 257, 613 N.W.2d 102. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2). "The well-established purpose of summary judgment procedure is to determine the existence of genuine factual disputes in order to 'avoid trials where there is nothing to try.' " *Yahnke,* 236 Wis. 2d 257, ¶ 10 (internal quotation marks omitted). When a non-moving party contests the appropriateness of summary judgment, we draw all reasonable factual inferences in favor of that party. *See Strasser v. Transtech Mobile Fleet Serv., Inc.,* 2000 WI 87, ¶ 32, 236 Wis. 2d 435, 613 N.W.2d 142.

¶ 14. Interpretation of Chapter 133 and its application to claims of anticompetitive conduct are questions of law, which we answer independently of the courts below. *See World Wide Prosthetic Supply, Inc. v. Mikulsky,* 2002 WI 26, ¶ 8, 251 Wis. 2d 45, 640 N.W.2d 764.

### III. PREDATORY PRICING LAW AND *BROOKE GROUP*

¶ 15. Conley alleges that the Journal's Sunday-daily conversion program in Waukesha County is an

anti-competitive predatory pricing scheme that violates Wis. Stat. § 133.03. This section, which is modeled after 15 U.S.C. § 2 (2000),[6] the federal Sherman Antitrust Act of 1890, provides in subsection 2 that:

> Every person who monopolizes, or attempts to monopolize, or combines or conspires with any other person or persons to monopolize any part of trade or commerce may be fined not more than $100,000 if a corporation, or, if any other person, may be fined not more than $50,000 or imprisoned for not more than 7 years and 6 months or both.

Wis. Stat. § 133.03(2). Although subsection (2) implies government enforcement, Chapter 133 also authorizes private actions for persons injured by violations of its prohibitions. *See* Wis. Stat. § 133.18. Such private plaintiffs may seek relief that includes treble damages and reasonable attorney fees. *Id.*

¶ 16. Predatory pricing occurs "chiefly in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 584 n.8 (1986).[7] The practice has been prohibited under antitrust laws for many years. *See* Phillip Areeda & Donald

---

[6] Wisconsin's statute may be traced to Chapter 219, Laws of 1893. *See Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914).

[7] *See also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222 (1993) (predatory pricing claims arise when a "business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market"); *Cargill, Inc. v. Monfort of Colo. Inc.,* 479 U.S. 104, 117 (1986) ("Predatory pricing may be defined as pricing below an

F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv. L. Rev. 697, 697 (1975); *see also Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 117–18 (1986). While claims premised on this theory have been litigated with some frequency in the federal courts, there is presently no Wisconsin case law governing predatory pricing claims under § 133.03(2). The dearth of state antitrust precedent is not surprising because the scope of Chapter 133 is limited to intrastate transactions. *See Reese v. Associated Hosp. Serv.,* 45 Wis. 2d 526, 532, 173 N.W.2d 661 (1970).

¶ 17. Recognizing the relative infrequency of actions under Chapter 133, Wisconsin courts have followed federal court interpretations of Sections 1 and 2 of the Sherman Act and have construed Wisconsin antitrust statutes in conformity with these federal court interpretations.[8] This is longstanding policy. We

appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run."); *Northeastern Tel. Co. v. Am. Tel. & Tel. Co.,* 651 F.2d 76, 86 (2d Cir. 1981) (describing a predatory pricing scheme as "the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition") (internal quotations omitted).

[8] *See, e.g., Prentice v. Title Ins. Co. of Minn.,* 176 Wis. 2d 714, 724, 500 N.W.2d 658 (1993); *State v. Waste Mgmt. of Wis., Inc.,* 81 Wis. 2d 555, 569 n.12, 261 N.W.2d 147 (1978); *City of Madison v. Hyland, Hall & Co.,* 73 Wis. 2d 364, 375, 243 N.W.2d 422 (1976); *State ex rel. Nordell v. Kinney,* 62 Wis. 2d 558, 563, 215 N.W.2d 405 (1974); *John Mohr & Sons, Inc. v. Jahnke,* 55 Wis. 2d 402, 410, 198 N.W.2d 363 (1972); *Reese v. Associated Hosp. Serv.,* 45 Wis. 2d 526, 532, 173 N.W.2d 661 (1970); *State v. Lewis & Leidersdorf Co.,* 201 Wis. 543, 549, 230 N.W. 692 (1930); *Pulp Wood,* 157 Wis. at 625. Most of these cases refer to

have pointedly declared that "the construction of sec. 133.01(1) [presently 133.03] is controlled by federal decisions under the Sherman Act." *Prentice v. Title Ins. Co. of Minn.,* 176 Wis. 2d 714, 724, 500 N.W.2d 658 (1993) (quoting *State v. Waste Mgmt. of Wis., Inc.,* 81 Wis. 2d 555, 569 n.12, 261 N.W.2d 147 (1978)); *see also Pulp Wood Co. v. Green Bay Paper & Fiber Co.,* 157 Wis. 604, 625, 147 N.W. 1058 (1914) (citing cases). *But see Carlson & Erickson Builders, Inc. v. Lampert Yards, Inc.,* 190 Wis. 2d 650, 665, 529 N.W.2d 905 (1995) (characterizing federal antitrust decisions as not controlling but merely guiding interpretations of state antitrust statutes). Our tradition of following federal antitrust law is nearly a century old, and Conley has not presented, nor have we located, *any* Wisconsin appellate decision applying Wisconsin antitrust law that has deviated from following a clear federal standard on similar antitrust matters.[9]

---

Wis. Stat. § 133.01, which was renumbered as Wis. Stat. § 133.03 by the repeal and recreation of Chapter 133 in 1980. *See* § 2, ch. 209, Laws of 1979.

Federal courts applying Wisconsin law have also commonly followed this principle of interpreting Wisconsin antitrust law consistent with federal precedent. *See, e.g., Westowne Shoes, Inc. v. Brown Group, Inc.,* 104 F.3d 994, 998 (7th Cir. 1997); *Henry G. Meigs, Inc. v. Empire Petroleum Co.,* 273 F.2d 424, 430 (7th Cir. 1960); *Lerma v. Univision Communications, Inc.,* 52 F. Supp. 2d 1011, 1015–16 (E.D. Wis. 1999); *Emergency One, Inc. v. Waterous Co., Inc.,* 23 F. Supp. 2d 959, 962 (E.D. Wis. 1998).

[9] Conley cites to Wisconsin appellate court decisions having generally held that federal court interpretations of a federal statute for which there is a state analog are not binding on Wisconsin courts construing that state law. However, none of the cases Conley cites involve application of antitrust law. *See Weber v. Weber,* 176 Wis. 2d 1085, 1092 n.7, 501 N.W.2d 413 (1993) (regarding interpretations of federal rules of civil proce-

¶ 18. Our adherence to federal antitrust precedent supports important Wisconsin policies. First and foremost, when the Wisconsin legislature enacted the state's mini-Sherman Act, it intended for courts to construe Chapter 133 consistent with the interpretations provided for analogous federal laws. In *Grams v. Boss,* 97 Wis. 2d 332, 294 N.W.2d 473 (1980), we explained:

> We have repeatedly stated that sec. 133.01, Stats., [presently 133.03] was intended as a reenactment of the first two sections of the federal Sherman Antitrust Act of 1890, 15 U.S.C. secs. 1 and 2, with application to intrastate as distinguished from interstate transactions and that the question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal court decisions under the Sherman Act.

*Id.* at 346. In the decades since this approach was adopted, we have relied upon the legislature's power to revise Chapter 133 if Wisconsin court adherence to federal antitrust doctrine is found to be objectionable.[10]

dure to comparable state rules of civil procedure); *Hoell v. LIRC,* 186 Wis. 2d 603, 610, 522 N.W.2d 234 (Ct. App. 1994) (citing *Marten Transp., Ltd. v. DILHR,* 176 Wis. 2d 1012, 1021–22, 501 N.W.2d 391 (1993)) (regarding construction of federal employment discrimination laws on interpretation of the Wisconsin Fair Employment Act); *see also State v. Cardenas-Hernandez,* 219 Wis. 2d 516, 528, 579 N.W.2d 678 (1998) (construction of federal rules of evidence versus state counterparts); *State v. Rochelt,* 165 Wis. 2d 373, 384, 477 N.W.2d 659 (Ct. App. 1991) (same); *State v. Blalock,* 150 Wis. 2d 688, 702, 442 N.W.2d 514 (Ct. App. 1989) (same).

[10] For a Wisconsin statutory initiative, see Wis. Stat. § 100.30, which is Wisconsin's unfair sales act.

¶ 19. We also conform our antitrust doctrine to the decisions of federal courts because Wisconsin courts have much less experience in antitrust matters than federal courts. This case highlights that rationale. As noted by the court of appeals in its certification, there is no Wisconsin case law on the subject of predatory pricing under Wis. Stat. § 133.03(2). Until now, no Wisconsin case has ever cited the 1993 *Brooke Group* decision or *Utah Pie Co. v. Continental Baking Co.*, 386 U.S. 685 (1967), the principal "primary-line injury" case before *Brooke Group*. Meanwhile, the breadth of federal antitrust precedent—particularly with regard to predatory pricing—provides the guidance of well-developed judicial experience in these matters. Conforming state law doctrine to federal law in this subject area avoids inconsistency and the resultant need for speculation as to the parameters of limited Wisconsin law.

¶ 20. Consistency also achieves uniform treatment between state and federal antitrust laws for Wisconsin businesses and promotes predictability. Both Chapter 133 and federal antitrust law have the same primary goal, which is to promote competition. *Compare Carlson*, 190 Wis. 2d at 662 ("Antitrust laws are intended to prevent restraints on free competition"), *with Matsushita*, 475 U.S. at 594 ("competition . . . [is] the very conduct the antitrust laws are designed to protect"). Both prohibit the same types of conduct, namely, restraints of trade and monopolizing or attempting to monopolize markets through unfair business practices. Therefore, adherence to federal court precedent minimizes conflict between the enforcement of state and federal antitrust laws and avoids subjecting Wisconsin businesses to divergent regulatory and civil liability for the same conduct.

¶ 21. Conley asks this court to depart from our longstanding practice and to ignore elements of the controlling federal law on predatory pricing. The seminal federal case addressing predatory pricing is the United States Supreme Court decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993). According to the United States Supreme Court, to succeed on a claim of predatory pricing a plaintiff must prove, first, that the defendant's "prices complained of are below an appropriate measure of its rival's costs," *id.* at 222, and, second, that the defendant has a dangerous probability of recouping its investment in below-cost prices, *id.* at 224.[11]

¶ 22. Characterizing the *Brooke Group* test as overly hostile to antitrust claims, Conley urges this court to modify the Court's standard for establishing predatory pricing.[12] In particular, Conley disputes *Brooke Group*'s formula for establishing recoupment.

---

[11] *Brooke Group*'s analysis spoke also in terms of a "reasonable prospect" of recoupment, *Brooke Group*, 509 U.S. at 210, because the plaintiff in that case alleged "primary-line" price discrimination under the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) (2000). The Court noted that the Robinson-Patman Act requires the lesser "reasonable possibility" standard as compared to the Sherman Act's "dangerous probability" standard. *Id.* at 222. However, the Court made it clear that the primary-line competitive injury being alleged in that case is of the same general character as the injury suffered by predatory pricing schemes under Section 2 of the Sherman Act and that the two-part analysis established in the case applies equally under both Acts. *Id.* at 221–22.

[12] In its certification memo, the court of appeals wrote that "it is *Brooke Group*'s addition of the 'recoupment' element of a predatory pricing claim that renders it nearly impossible to succeed on a predatory pricing claim." However, the concept of recoupment was discussed long before *Brooke Group*. For in-

Under *Brooke Group,* to establish the requisite prospect of recoupment under the second prong of a predatory pricing analysis, "[t]he plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.* at 225.

¶ 23. Conley parses the preceding statement into two parts: (1) the likelihood of a rise in the predator's prices above a competitive level; and (2) the price increase would be sufficient to compensate for the losses incurred during the period of below-cost pricing. Conley then offers multiple, interrelated reasons for why this court should refrain from adopting the second half of the *Brooke Group* recoupment standard.

¶ 24. First, Conley contends that embracing both parts of the recoupment prong is inconsistent with the legislative command in Wis. Stat. § 133.01 that Chapter

stance, in *Northeast Telephone Co. v. American Telephone & Telegraph Co.,* 651 F.2d 76 (2d Cir. 1981), Circuit Judge Irving R. Kaufman wrote:

> For unremunerative pricing to make economic sense, the predator must be assured that he will be able to *recoup* his short term losses in the future. But because a dollar now is worth more than a dollar later (because of both inflation and the time value of money), he must be reasonably certain that once his prey has fallen, he will be able to reap supranormal returns.

*Id.* at 89 (emphasis added). In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986), Justice Powell wrote: "The forgone profits may be considered an investment in the future. For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, *more than the losses suffered.*" *Id.* at 588–89 (emphasis added).

133 be interpreted in a manner which gives "the most liberal construction to achieve the aim of competition," *Carlson,* 190 Wis. 2d at 662, and with the aspiration for "vigorous private enforcement of antitrust laws." *Id.* at 664 (quoting *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 745 (1977)). These hortatory statements offer little help, however, in determining what substantive elements this court should adopt for a claim of predatory pricing. Wisconsin Stat. § 133.01 condemns only "*unfair and discriminatory* business practices which destroy competition." (Emphasis added.) Despite Conley's intimations, *Brooke Group* does not eliminate or even constrict the enforcement of true antitrust violations. The decision simply defines what an antitrust violation is, at least under the theory of predatory pricing, and what aggressive business practices must accomplish to cross the line and improperly thwart the aims of competition. Therefore, citation to § 133.01 and discussion of the benefits of private enforcement beg the question of whether conduct that does not meet the standard set in *Brooke Group is* anticompetitive and unlawful, and should thus be prohibited.

¶ 25. Conley advances another argument for ignoring the second element of *Brooke Group*'s recoupment standard. According to Conley, the standard creates an evidentiary burden that no plaintiff can ever meet, resulting in a near impossibility of plaintiffs surviving summary judgment with claims of predatory pricing. Conley points to recent commentary observing that "[j]udicial enforcement is at a low level following the Supreme Court's most important predatory pricing decision in modern times [*i.e., Brooke Group*]. Indeed, since *Brooke* was decided in 1993, no predatory pricing plaintiff has prevailed on the merits in the federal

146

courts." Patrick Bolton et al., *Predatory Pricing: Strategic Theory and Legal Policy,* 88 Geo. L.J. 2239, 2241 (2000).

¶ 26. That predatory pricing claims have rarely, if ever, prevailed under the *Brooke Group* standard speaks little about the merits of the standard.[13] Contrary to Conley's assertions, the issue in deciding whether to adopt *Brooke Group* is not whether predatory pricing is, or should be, a prohibited practice. It is. Nor is the issue whether evidence can ever be presented to satisfy the standards for proving a true instance of predatory pricing. Such evidence can be marshaled in circumstances where predation has occurred.[14] Rather, Conley's quarrel is over *how* predatory pricing is defined and the criteria courts must use to assess whether a particular business practice violates the prohibition against predatory pricing. *Brooke Group* sets forth a

---

[13] There is substantial evidence that predatory pricing claims in federal courts had severe difficulty prevailing even before *Brooke Group* was decided. *See generally* Frank H. Easterbrook, *Predatory Strategies and Counterstrategies,* 48 U. Chi. L. Rev. 263, 314 (1981).

[14] Even the source that Conley offers to show the difficulty of surviving summary judgment in predatory pricing cases post-*Brooke Group* cites three cases where federal courts refused to grant a defendant's motion for summary disposition of a predatory pricing claim. Patrick Bolton et al., *Predatory Pricing: Strategic Theory and Legal Policy,* 88 Geo. L.J. 2239, 2260 n.124 (2000) (citing *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns,* 63 F.3d 1540 (10th Cir. 1995); *Aventura Cable Corp. v. Rifkin/Narragansett S. Fla. CATV Ltd. P'ship,* 941 F. Supp. 1189 (S.D. Fla. 1996); *Servicetrends, Inc. v. Siemens Med. Sys., Inc.,* 870 F. Supp. 1042 (N.D. Ga. 1994)). These cases were later settled out of court, precluding their chance to succeed on the merits. *See* Bolton et al., *supra,* at 2259 & n.118.

rational and reasoned method for accomplishing this assessment. Other articulations of the prerequisites for recoupment under predatory pricing are plausible. Yet, even these alternative standards must face the ever-present quandary of predatory pricing litigation: Are the standards so over-inclusive that they prohibit lawful, yet aggressively competitive conduct, or so under-inclusive that they encourage unlawful conduct and permit it to go unpunished? *See* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 6.5a at 281 (2d ed. 1999).[15]

¶ 27. In *Brooke Group,* the Court justified its legal standard by observing that overzealous litigation that erroneously awards damages based on unwarranted predatory pricing claims stifles legitimate competition. According to the Court:

> [The *Brooke Group*] prerequisites to recovery are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury. As we have said in the Sherman Act context, "predatory pricing schemes are rarely tried, and even more rarely successful," *Matsushita,* [475 U.S.] at 589, and the costs of an erroneous finding of liability are high. "[T]he mechanism by which

[15] Conley's argument questioning the merit of requiring recoupment levels sufficient to compensate the amounts spent on predation is partially of a chicken-and-egg/cause-versus-effect variety. Do predatory pricing claims rarely succeed because the *Brooke Group* standard is too high and omits from its purview true instances of predatory pricing? Or, does *Brooke Group*'s standard correctly protect against false claims and the reason that these claims fail is because they do not actually allege conduct that is against the interests of competitive markets? At best, Conley's analysis dismissively entertains the second possibility.

a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition; because 'cutting prices in order to increase business often is the very essence of competition . . . [;] mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect.' " *Cargill,* [479 U.S.] at 122 n.17 (quoting *Matsushita,* [475 U.S.] at 594). It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.

*Brooke Group,* 509 U.S. at 226–27. We agree with the tenor and logic of this statement. If erroneous allegations of predatory pricing are leveled against a competitor who is merely selling at lower prices than its competitors but who has legitimate business reasons for this pricing strategy, it is not consonant with § 133.01's objective of competition to give these claims credence.[16]

¶ 28. Adoption of a predatory pricing standard authorizing successful claims when no harmful activity has occurred would be detrimental to market competition and consumer welfare in Wisconsin. Without the complete recoupment element of *Brooke Group,* there would be considerable uncertainty whether a predatory practice has occurred that will actually harm consumer interests through the charging of monopoly prices. As the Court noted in *Brooke Group,* recoupment of this nature is an essential element of real market injury. *Id.*

---

[16] Claims under Section 2 of the Sherman Act cannot succeed if a defendant's dominant market share resulted from "a superior product, business acumen, or historical accident." *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039, 1060 (8th Cir. 2000) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966)).

at 226. It is competition, not competitors, that antitrust law protects. *Id.* at 224 (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)).

■

¶ 29. Furthermore, the language that Conley asks this court to disregard is part of a restrictive clause to the sentence describing the recoupment standard. Therefore, if this court were to delete this clause, we would necessarily be altering the meaning of recoupment as stated by the Court. This observation is more than grammatical; it exposes a substantive flaw in Conley's argument. Conley concedes, as it must, that the charging of low prices, even if it destroys a competitor, does not harm consumers *unless* the alleged predator later raises its prices above a competitive level and charges monopoly prices exceeding those otherwise available in a competitive market. "Recoupment is the ultimate object of an unlawful predatory pricing scheme; it is the means by which a predator profits from predation. Without it, predatory pricing produces lower aggregate prices in the market, and consumer welfare is enhanced." *Id.* at 224.

¶ 30. Without a required showing of recoupment as articulated under *Brooke Group,* courts would be permitted to find a dangerous probability of recoupment by inference, rather than by proof. This is precisely the legal standard that Conley asks this court to adopt in *Brooke Group*'s stead. As a replacement for the second clause of the recoupment requirement, Conley suggests that all that is required to demonstrate recoupment is a "structural" showing of the possibility of a monopoly, which would require proof of two factors: (1) that the relevant market is already highly concentrated; and (2) the existence of high barriers to the entry of former or new competitors into the market. *See*

3 Phillip Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* 297 (2d ed. 2002) (discussing this theory). In other words, if a monopoly results from a defendant's practice and the entry of competitors into the market is sufficiently difficult, then the demonstration of below-cost pricing would be sufficient for a competitor to succeed on a predatory pricing claim against its adversary and, as a result, be awarded treble damages from its competitor.

¶ 31. We recognize that leading antitrust commentators observe that the proof necessary to establish the second clause of recoupment has yet to be fully determined. *See* Areeda & Hovenkamp, *supra,* at 322. *Brooke Group* did not reach the issue of whether its test requires proof not only of significantly supracompetitive pricing, actual or prospective, but also of the amount and duration of that pricing. *Id.* (citing *Brooke Group,* 509 U.S. at 223). However, commentators also recognize that a business's attainment of monopoly positioning does not, ipso facto, mean that it has a dangerous probability of recouping all its losses.[17] While the existence of a monopoly indisputably facilitates an ability to recoup losses resulting from preda-

---

[17] Commentators who recognize (or even recommend) Conley's market structure argument generally use market structure as a shield, *not* a sword, in predatory pricing litigation. It filters out unmeritorious claims and *then* traditional predatory pricing analysis is applied to those defendants that pass the structural prerequisites. *See* Richard A. Posner, *Antitrust Law* 217 (2d ed. 2001); Paul L. Joskow & Alvin K. Klevorick, *A Framework for Analyzing Predatory Pricing Policy,* 89 Yale L.J. 213, 242–50 (1979); Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* § 8.4a, at 346–48 (2d ed. 1999).

tory pricing, and perhaps is a necessary condition for successful recoupment, it is not sufficient to assure recoupment. *See* Frank H. Easterbrook, *Predatory Strategies and Counterstrategies,* 48 U. Chi. L. Rev. 263, 272 (1981). A monopolizing enterprise will find it difficult to charge monopoly prices for a product when the demand for that product is relatively elastic (meaning that consumer demand is sensitive to price changes), so long as reasonable substitute products are available in the relevant market.[18]

¶ 32. Finally, Conley cites some scholarly criticism of *Brooke Group's* requirement for establishing recoupment. Conley claims that these critiques suggest a transitory nature to current federal antitrust doctrine on predatory pricing, which counsels against this court's full adoption of *Brooke Group.* We have reviewed the sources that Conley purports demonstrate a declining confidence in the *Brooke Group* test. These sources do not approach such a critical mass in the legal commentary that they excite a conviction that the standards set forth in *Brooke Group* are erroneous or otherwise imprudent.[19] It is axiomatic that most judi-

---

[18] *See Advo Inc. v. Phila. Newspapers, Inc.,* 51 F.3d 1191, 1203 (3d Cir. 1995) ("[A] monopolist can [not] charge any price it wants. ... [A]n exclusive seller will raise prices only to the point where the higher price is not more than offset by a decrease in quantity demanded. The shape of the demand curve constrains the behavior of all sellers, even monopolists."); *see also* Hovenkamp, *supra,* § 1.2a at 13 ("A monopolist's market power is a function of the elasticity of demand for its product."); Easterbrook, *supra,* at 302–03 (explaining that while elasticities of demand are difficult to measure, they are essential to determining the social costs of a monopoly).

[19] Conley cites to Patrick Bolton et al., *Predatory Pricing: Strategic Theory and Legal Policy,* 88 Geo. L.J. 2239 (2000);

cial decisions—and certainly those of the United States Supreme Court—inspire some degree of commentary among other courts (or even within the same court, as in the case of a dissenting opinion) and among scholars. Some of this commentary will invariably be critical. More relevant to our present analysis is the silence within federal courts of any criticism over the *Brooke Group* test. In fact, federal courts have largely endorsed the *Brooke Group* rationale.[20]

David F. Shores, *Law, Facts and Market Realities in Antitrust Cases After Brooke and Kodak,* 48 SMU L. Rev. 1835 (1995); Phillip Areeda & Herbert Hovenkamp, 3 *Antitrust Law* (2d ed. 2002). Given Conley's extensive reliance on the Areeda and Hovenkamp treatise, which Conley cites as providing some of the harshest criticisms against *Brooke Group,* it is worth noting that Professor Areeda was the counsel appearing on behalf of the petitioner/non-prevailing party before the United States Supreme Court in *Brooke Group. See Brooke Group,* 509 U.S. at 211. In addition, the Bolton article has itself been sharply criticized. *See* Kenneth G. Elzinga & David E. Mills, *Predatory Pricing and Strategic Theory,* 89 Geo. L.J. 2475 (2001).

[20] A sampling of some recent federal cases fully applying *Brooke Group* includes: *Bailey v. Allgas, Inc.,* 284 F.3d 1237, 1245, 1256 (11th Cir. 2002); *Virgin Atl. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 259 (2d Cir. 2001); *Bridges v. MacLean-Stevens Studios, Inc.,* 201 F.3d 6, 13–14 (1st Cir. 2000); *Taylor Publ'g Co. v. Jostens, Inc.,* 216 F.3d 465, 477 (5th Cir. 2000); *Stearns Airport Equip. Co., Inc. v. FMC Corp.,* 170 F.3d 518, 536 (5th Cir. 1999); *Nat'l Parcel Servs., Inc. v. J.B. Hunt Logistics, Inc.,* 150 F.3d 970, 971 (8th Cir. 1998) *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191, 1192 (3d Cir. 1995); *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.,* 135 F. Supp. 2d 1031, 1041–42 (N.D. Cal. 2001); *United States v. AMR Corp.,* 140 F. Supp. 2d 1141, 1209–15 (D. Kan. 2001); *Mathias v. Daily News, L.P.,* 152 F. Supp. 2d 465, 473 (S.D.N.Y. 2001).

¶ 33. In any event, the relative amount of scholarly criticism advanced against *Brooke Group* does not affect whether that decision is the controlling federal law on predatory pricing claims. Absent the Supreme Court modifying the *Brooke Group* test, we adopt it in its entirety for assessing predatory pricing claims under § 133.03. We see no compelling reason to depart from this court's sound and longstanding practice of deferring to federal antitrust principles and conforming our interpretations of Chapter 133 to federal court interpretations of the Sherman Antitrust Act.

## IV. *DAUBERT v. MERRELL DOW PHARMACEUTICALS*

¶ 34. Before turning to the sufficiency of the evidence in this case, we address a matter related to the circuit court's use of expert testimony. In certifying this appeal, the court of appeals suggested that this case presents an opportunity for this court to revisit our rejection of the standard articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court of appeals observed what it calls a tension between the principle that Wisconsin courts conform Wisconsin antitrust law to federal law and the principle that federal antitrust case law invokes the *Daubert* "gatekeeper" role of a trial court in admitting expert testimony. The court of appeals suggested that we

Some federal cases have limited the effect of *Brooke Group*, but not in settings that directly involve predatory pricing. *See, e.g., LePage's Inc. v. 3M,* 324 F.3d 141, 168 (3d Cir. 2003) (limiting *Brooke Group* to only claims of predatory pricing); *Chroma Lighting v. GTE Prods. Corp.,* 111 F.3d 653, 658 (9th Cir. 1997) (concluding that *Brooke Group* does not extend to second-line price discrimination cases).

address the *Daubert* rule either on a broad scale or on a basis limited to antitrust cases, such as this predatory pricing claim.[21]

¶ 35. Whatever merit there may be in revisiting Wisconsin law on the admissibility of expert testimony in light of *Daubert,* we do not believe that this case presents the proper vehicle. The *Daubert* standard governs the admissibility of expert opinions and deals with the threshold reliability of an expert's opinion. In the present action, the parties do not dispute the qualifications of any experts or the relevancy of their testimony. Because the admissibility of an expert's opinion was not challenged in this appeal, the *Daubert* issue is not sufficiently present to require a decision. Rather, as explained below, the central question presented involves *how* the circuit court considered the admissible expert testimony in reaching its decision to grant summary judgment.

---

[21] In the federal system, trial courts have a significant "gatekeeper" function in keeping from the jury expert testimony that is deemed unreliable. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) (scientific expert testimony); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) (general expert testimony).

By contrast, the trial court's gatekeeper role in Wisconsin is limited. *See Green v. Smith & Nephew AHP, Inc.,* 2000 WI App 192, ¶ 21, 238 Wis. 2d 477, 617 N.W.2d 881, *aff'd,* 2001 WI 109, 245 Wis. 2d 772, 629 N.W.2d 727. In Wisconsin, "Once the relevancy of the evidence is established and the witness is qualified as an' expert, the reliability of the evidence is a weight and credibility issue for the fact finder and any reliability challenges must be made through cross-examination or by other means of impeachment." *State v. Peters,* 192 Wis. 2d 674, 690, 534 N.W.2d 867 (Ct. App. 1995); *see also State v. Walstad,* 119 Wis. 2d 483, 516, 518–19, 351 N.W.2d 469 (1984).

155

## V. SUFFICIENCY OF CONLEY'S EVIDENCE

██

¶ 36. Even though the *Brooke Group* standard is being adopted as Wisconsin law for predatory pricing claims, Conley maintains its challenge to the circuit court's grant of summary judgment.

¶ 37. In response to the Journal's motion for summary judgment, Conley retained an expert, Dr. Frank Gollop, to present evidence of predatory pricing. Gollop provided an 11–page report stating, among other things, that both requirements of a predatory pricing scheme are present in the Journal's Sunday-daily conversion program. Specifically, he concluded that the Journal was supplying daily newspapers to Waukesha County subscribers for less than the relevant measure of cost, which he considered to be the incremental, or marginal, cost of producing and distributing an extra newspaper.[22] As to recoupment, Gollop stated that once the Journal drives the *Freeman* out of business it will have a monopoly in Waukesha County and, therefore, will recoup losses incurred during the time it sold newspapers at below cost. Gollop was the only expert who testified on Conley's behalf regarding the alleged predatory nature of the Journal's program. Meanwhile,

---

[22] Neither the Court in *Brooke Group* nor other federal courts have definitively taken a position on which various cost measures are an "appropriate measure," although many federal circuits have regarded marginal cost and average variable cost as the most appropriate. *See generally Multistate Legal Studies,* 63 F.3d at 1549 n.5. Whatever standard is used, "the problem of measurement is apt to be acute." Posner, *supra,* at 215. We do not address this issue because, on the basis of the Journal's summary judgment motion, we assume that Gollop's measure of cost was appropriate.

156

the Journal offered expert testimony to disprove that any predatory pricing occurred under the program.

¶ 38. The circuit court ruled that Dr. Gollop failed to provide sufficient evidence as to "the material issue of whether or not the total advertising revenue . . . [a]s folded into the price of the paper is below the cost to the Journal." In other words, the court concluded that Conley had presented incomplete evidence as to whether the Journal was providing its newspapers at unprofitable levels. Regarding the recoupment element, the court determined that Conley had failed to make any showing that the Journal would eventually be charging supracompetitive prices for its paper, what probable amount the Journal would need to recoup for its losses, or even that the Journal had suffered or will suffer a loss as a result of the Sunday-daily conversion program.

¶ 39. Conley contends that the circuit court, in reaching these conclusions, usurped the function of the jury by weighing conflicting expert testimony regarding the existence of predatory pricing. Conley argues that the proffered expert testimony was sufficient to raise a genuine issue of material fact as to whether the Journal's Sunday-daily conversion program constituted predatory pricing and, thus, is an unlawful, anticompetitive practice. According to Conley, summary judgment is never appropriate when qualified experts differ.

¶ 40. We disagree with Conley and conclude that it failed to offer sufficient expert testimony, or other prima facie evidence, to support its antitrust claim of predatory pricing.

¶ 41. As to the issue of below-cost pricing, we look to the specific conduct that is questioned. The Sunday conversion plan amounted, in effect, to a temporary, net discount of no more than 50% off the newspaper's

published rates for certain subscribers—namely, those previously receiving Sunday service and who, after conversion, also receive daily service. The 50% discount benchmark was followed by the Journal because industry standards require that subscribers be charged at or above this rate if each subscription is to be included in the newspaper's audited circulation figures. It is undisputed in the record that the Journal has offered this Sunday-daily conversion at different times throughout the Milwaukee metropolitan area, not just in Waukesha County. In many locations where the discount was offered, the Journal already monopolized both the daily and Sunday newspaper market, obviating any issue of anticompetitive conduct in those regions.

¶ 42. The Journal does not argue that, if circulation costs and subscription revenue were the only appropriate measures of cost and revenue, there would be no evidentiary basis for a finding of below-cost pricing. The record demonstrates, based on circulation accounting alone, that the marginal costs of producing and distributing numerous weeks of the daily newspaper to these conversion subscribers would exceed the nominal subscription revenue the Journal received by slightly decreasing the length of its Sunday newspaper obligations. Although the Journal argues that increased subscribership after the promotional period ends may, in the long term, overcome this loss, this speculative result is too tenuous a basis for determining the Journal's actual net revenue from engaging in the program.

¶ 43. However, the Journal does contend that subscription revenue is an incomplete measure of the revenue that is directly derived from its Sunday-daily conversion program. In the newspaper industry, subscription rates represent a minority fraction of the

revenue that a newspaper publisher garners from circulating each newspaper. According to an expert for the Journal, advertising revenue generally comprises 75% to 80% of total newspaper revenue. These figures are not controverted by Conley. We are mindful that many newspapers are distributed free. Although this observation has limited effect on our legal analysis,[23] it underscores the fact that advertising revenue may be virtually the exclusive source of revenue for some newspapers.

¶ 44. The question, then, is whether advertising revenue directly derived from increased circulation, even when the circulation is generated by substantial discounts that impose no additional costs to subscribers, must be considered when determining whether below-cost pricing occurred. We conclude that these revenues must be included, as a matter of law, when making this determination in a market analysis for daily paid newspapers.[24] If specific conduct is alleged to

---

[23] To be sure, these free newspapers are rarely, if ever, daily newspapers, and rarely, if ever, are distributed by means of home delivery. Moreover, the relevant market in this action is that of paid daily newspapers in Waukesha County. Therefore, the existence of free weekly newspapers inside or outside of Waukesha County does not impact the legal analysis of predatory pricing.

[24] In predatory pricing cases, disputes over below-cost pricing usually focus on the difficulties in calculating an appropriate measure *of cost.* Volumes of scholarship have been written regarding how a firm's costs during predation should be measured, and courts have wrestled over this matter. *See generally* Hovenkamp, *supra,* § 8.2–8.3 at 337–45. The "price" component from which any measure of cost is compared is frequently easier to observe: What did the firm selling its units charge to

be predatory, then all revenue directly flowing from that challenged conduct must be offset against the costs of that enterprise.

¶ 45. The evidence presented by Dr. Gollop when he assessed whether the conversion program had net losses simply ignored this necessary measure of revenue attributable to increased circulation. Therefore, Gollop failed to adequately consider whether increased circulation, and its resultant increase in advertising revenue, could exceed the costs of the Sunday-daily conversion program. Because of this omission we must assume, on the basis of the summary judgment record, that each additional daily *Journal Sentinel* subscription generates approximately $200 in additional annual advertising revenue. The Journal offered these figures into evidence and Conley did not offer any competing estimates. Meanwhile, the only cost figures Gollop presented were losses of $66 for each subscriber who converted from a 26–week Sunday subscription to a 22–week Sunday and daily subscription. Extrapolating from this figure, the Journal's costs for converting a 52–week Sunday subscription would be proportionally larger than $66, but they would not be greater than $200.

¶ 46. Conley's only response to its failure to address the incremental advertising revenue earned by increased circulation is to assert that a disagreement exists between the experts as to whether this factor

whomever receives those units? While some ancillary revenue is far too contingent, speculative, and otherwise improper to attribute to any sale, revenues from newspaper sales and distribution cannot be confined simply to the price charged to subscribers or other purchasers of the product.

should be included in the calculus.[25] We have already explained why figures addressing these revenues must be included to satisfy a showing of predatory losses. In any event, Dr. Gollop *never* contended that advertising revenue should be excluded in an analysis of predatory pricing in the context of the newspaper conversion program. At his deposition, Gollop only stated that he did not *believe* that advertising revenue would overcome any losses incurred from subtracting incremental circulation costs from incremental circulation revenues, admitting that he did not have any figures concerning this matter:

> [Question]: Did your analysis take into account any increased advertising revenue associated with maintaining or increasing subscriptions?
>
> [Gollop]: It does so only in the following sense. That if each additional conversion program generates a net loss to the Journal of $66, I really didn't think it was necessary to say that one additional subscription would generate $66 in advertising revenue. If you can show that, that would be terrific. I don't have that kind of data, but I just can't believe one subscription generates $66 in added advertising revenue.
>
> [Question]: You don't know one way or another?
>
> [Gollop]: I don't.

Doctor Gollop's conscious disregard of this revenue

[25] Conley also suggests, based on a *Journal Sentinel* Circulation Department 2000 Marketing Plan that shows a net loss based on the conversion program discounts, that the Journal shows at least a $0.35 loss per daily newspapers supplied to a subscriber under the program. However, this document does not summarize *all* costs and revenues related to the conversion program nor does it suggest a cost analysis beyond that experienced only by the newspaper's circulation department.

source cannot insulate Conley from its burden of presenting sufficient prima facie evidence of predatory pricing.

¶ 47. It is apparent that Conley wants the best of both worlds when it comes to the role of advertising revenue in a predatory pricing claim. On the one hand, Conley defends its expert's decision not to include advertising revenue from increased circulation as an appropriate component in a revenue-cost differential.[26] Meanwhile, Conley complains that one of the primary damages it suffers as a result of the Sunday-daily conversion program is the loss of advertising dollars from its decreased circulation. In Conley's own words, "In the newspaper business, it is common knowledge that a decline in circulation leads to a decline in advertising revenues and that decline in advertisers leads to further declines in circulation." Conley's acknowledgment in this regard is fatal to its argument.

¶ 48. As to recoupment, Conley fares no better. Assuming *arguendo* that below-cost sales occurred, to establish the recoupment element of a predatory pricing claim Conley had to present some proof of a "dangerous probability" that the Journal would recoup the discounted value of its predation losses by charging monopolistic prices after the *Freeman* was driven from the market. *Brooke Group,* 509 U.S. at 224. As noted by Judge Hassin, Dr. Gollop failed to present *any* evidence of how much the Journal would have to increase either

___

[26] Despite Gollop's omissions in this matter, at both his deposition and in his report Gollop proclaimed that newspapers increase circulation precisely to increase advertising revenues, that circulation and advertising sales are highly correlated, and that advertisers will pay higher advertising rates as a newspaper's circulation increases.

162

its subscription rates or advertising rates, or for how long, in order for the *Journal Sentinel* to recover any purported losses.[27] Likewise, no evidence was presented regarding how the market would tolerate any price increases above competitive levels. Gollop never even surmised such results.

¶ 49. The Court in *Brooke Group* clearly stated that "[d]etermining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market." *Brooke Group,* 509 U.S. at 226. Gollop did not perform a close analysis of the scheme alleged or the conditions of the market. Without such evidence, a jury could not reasonably determine whether Conley satisfied the recoupment element of *Brooke Group* without engaging in sheer speculation. The need for such evidence was made clear by the Court's additional instruction that, "If market circumstances *or deficiencies in proof* would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed." *Id.* While the Court followed this statement by indicating that the realization of a monopoly position is a market circumstance that would facilitate recoupment, it stopped short of adopting Conley's "market structure" argument.[28] It is

---

[27] Perhaps the most fundamental hurdle facing Conley's evidence of a dangerous probability of recoupment is its failure to establish below-cost pricing. Without a complete sense of the investment that the Journal has sunk into the Sunday-daily conversion program, it is impossible to know its relative needs for recoupment.

[28] For an informative discussion of the limitations facing a newspaper operating as a monopolist in a market with compet-

this market structure argument, and only this premise, from which Gollop concluded that the Journal could meet the recoupment requirement for a predatory pricing claim.[29] In fact, we imagine that this flaw in Conley's proof is precisely why it advances the argument that this court should reject the bulk of *Brooke Group*'s recoupment standard.

¶ 50. Overall, we conclude that the circuit court did not usurp the jury's fact-finding role in granting summary judgment in this case. As did the circuit court, we have not assessed the credibility of Dr. Gollop's testimony. Rather, accepting his expert testimony, we conclude that Dr. Gollop's evidence failed to address material elements of Conley's claims. Under any view of the facts, essential elements of Conley's claim cannot be proved on this record and, therefore, summary judgment is appropriate. *See Schurmann v. Neau,* 2001 WI App 4, ¶ 7, 240 Wis. 2d 719, 624 N.W.2d 157.

¶ 51. Once again, we look to *Brooke Group* for guidance on the role that experts play in summary judgment proceedings in cases alleging predatory pricing.[30] According to the Court:

---

ing sources of news and advertising media, see *Reilly v. Hearst Corp.,* 107 F. Supp. 2d 1192, 1201 (N.D. Cal. 2000).

[29] We accept Dr. Gollop's view that the barriers to entry in the local newspaper market are significant due to high fixed costs and the necessity of sustaining losses for a long period of time while the newspaper attempts to penetrate embedded subscriber and advertiser loyalty in incumbent papers.

[30] Because the function of summary judgment procedure in federal and state courts is the same, federal decisions regarding summary judgment may be considered persuasive authority in interpreting Wisconsin's summary judgment rule. *Yahnke v. Carson,* 2000 WI 74, ¶ 10, 236 Wis. 2d 257, 613 N.W.2d 102.

> When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them.

*Brooke Group,* 509 U.S. at 242 (citation omitted). Expert testimony provides a jury with insight it otherwise lacks due to a layperson's unfamiliarity with complex concepts. *See County of Kenosha v. C & S Mgmt., Inc.,* 223 Wis. 2d 373, 415, 588 N.W.2d 236 (1999). In the domain of predatory pricing claims, cost accounting, the role of various measures of cost, and market phenomena are precisely the sort of complex matters for which experts are needed. However, a jury, which is the ultimate arbiter of the veracity of the facts offered, is not required to complete a complex economic analysis when the non-moving party does not present sufficient facts to establish an essential component of that analysis. In order to defeat a properly supported motion for summary judgment, a party may not rest on conclusory or incomplete expert analysis that lacks a sufficient factual foundation. *See Advo Inc. v. Phila. Newspapers, Inc.,* 51 F.3d 1191, 1198–99 (3d Cir. 1995) (affirming summary judgment dismissing predatory pricing claim because expert affidavit failed to present facts establishing a genuine issue of below-cost pricing).[31]

This recognition is especially proper in the context of antitrust litigation, where federal court experience in summary proceedings involving antirust claims is much greater than state courts.

[31] *See also Virgin Atl. Airways Ltd. v. British Airways PLC,* 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999) ("[A]n expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the

¶ 52. The evidence proffered by Conley, including its expert testimony on the predatory pricing claim, provides an insufficient basis to proceed to a jury trial. Because a reasonable jury faced with this evidence would have no factual basis for concluding that the Journal's promotional scheme was operating below-cost, there are no genuine issues of material fact. *See Baxter v. DNR,* 165 Wis. 2d 298, 312, 477 N.W.2d 648 (Ct. App. 1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "[O]nce sufficient time for discovery has passed, it is the burden of the party asserting a claim on which it bears the burden of proof at trial 'to make a showing sufficient to establish the existence of an element essential to that party's case.' " *Transp. Ins. Co., Inc. v. Hunzinger Const. Co.,* 179 Wis. 2d 281, 291–92, 507 N.W.2d 136 (Ct. App. 1993) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). On the basis of the summary judgment record, Conley has failed to meet this requirement.

¶ 53. Finally, we briefly address Conley's argument regarding its evidence of the Journal's alleged predatory intent. Although Conley makes much of the Journal's aggressive efforts to target readership and strengthen its sales position in Waukesha County, this emphasis is not very probative of any specific anticompetitive practice. The population of Waukesha County at the time the contested programs were implemented was expanding and, as noted by Journal personnel, is composed of people the Journal assessed as the most likely to read a daily newspaper. Competition is a very harsh reality in the world of newspapers, and the

case."), *aff'd,* 257 F.3d 256 (2d Cir. 2001); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir. 1989).

market forces inherent in the daily newspaper market frequently lead to natural local monopolies. *See Reilly v. Hearst Corp.,* 107 F. Supp. 2d 1192, 1198 (N.D. Cal. 2000). The Journal is permitted to lawfully compete against Conley, even to the extent of trying to have *Freeman* subscribers switch to becoming *Journal Sentinel* readers. *See Indep. Milk Producers Co-op v. Stoffel,* 102 Wis. 2d 1, 10, 298 N.W.2d 102 (Ct. App. 1980) ("It is not illegal for a company to try to attract business, especially at the expense of a competitor. Such practices are everyday occurrences in the business world."). It is well understood that activities that have a legitimate business justification are not anticompetitive, even by a monopolist. *See Virgin Atl. Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 266 (2d Cir. 2001) ("even with monopoly power, a business entity is not guilty of predatory conduct through excluding its competitors from the market when it is simply exploiting competitive advantages legitimately available to it"); *United States v. AMR Corp.,* 140 F. Supp. 2d 1141, 1193 (D. Kan. 2001).

## VI. CONCLUSION

¶ 54. Based on the foregoing reasons, we adopt the standards articulated by the United States Supreme Court in *Brooke Group* as governing predatory pricing claims in Wisconsin under Wis. Stat. § 133.03(2). In addition, we conclude that, based on the summary judgment record presented before the circuit court, Conley failed to present evidence sufficient for any reasonable jury to find that the Journal's Sunday-daily conversion program constituted predatory pricing and was therefore an unlawful, anticompetitive practice

waged against the *Freeman*. Therefore, summary judgment in favor of the Journal was appropriate.

 *By the Court.*—The judgment of the circuit court is affirmed.